**STATE BANK & TRUST COMPANY OF GOLDEN MEADOW**

v.

**BOAT "D.J. GRIFFIN", Its Engines, Tackle, Apparel, etc. BOAT "JOEY G", Its Engines, Tackle, Apparel, etc. in Rem.**

**Derris Griffin Boat Operators, Inc. in Personam.**

Civ. A. No. 84–3383.

United States District Court, E.D. Louisiana.

Jan. 8, 1991.

Robert E. Barkley, Jr., Barkley & White, Patricia D. Tunmer, Sessions & Fishman, New Orleans, La., John D. Ziober, Shockey & Ziober, Baton Rouge, La., for plaintiff.

Lloyd N. Shields, Susan Tart, Simon, Peragine, Smith & Redfearn, New Orleans, La., for defendant and plaintiff-in-counterclaim, Derris Griffin Boat Operators, Inc.

## MEMORANDUM OPINION

MENTZ, District Judge.

This matter was tried before the Court for six days beginning on September 13, 1990. After considering the record and the evidence adduced at trial, the Court finds as follows.

To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such; to the extent that any of the conclusions of law constitute findings of fact, they are so adopted.

### Introduction

This suit was filed by State Bank & Trust Company of Golden Meadow ("State Bank"), as an *in rem* action to foreclose on preferred maritime mortgages on two vessels, the "D.J. GRIFFIN" and the "JOEY G", owned and operated by Derris Griffin Boat Operators, Inc. ("Boat Operators"), and as an *in personam* action against Boat Operators on the basis of an endorsement of a promissory note for $1,310,000 dated December 23, 1982. The vessels were subsequently seized by the United States Marshal and sold at auction on October 19, 1984, for a total of $205,000. Said sums were then deposited into the registry of the Court pending further orders of the Court.

In response, Boat Operators denied liability on the promissory note and denied that the vessel mortgages were validly pledged to secure it. Additionally, in 1985 Elta Griffin, derivatively for the benefit of and on behalf of Boat Operators, sued State Bank in counterclaim for wrongful seizure of its vessels.[1] The primary issue before the Court is whether Derris Griffin, as president of Boat Operators, had authority to endorse the $1,310,000 hand note made by two separate Derris Griffin corporations on behalf of Boat Operators and pledge Boat Operators' assets for an indebtedness of those two unrelated corporations. In connection with this issue, the Court must also decide whether State Bank knew or should have known that Derris Griffin was acting outside his authority when he endorsed the hand note and pledged the assets of Boat Operators to secure the indebtedness of the two unrelated corporations. A further issue to be decided by the Court

---

**1.** Mrs. Griffin also brought other counterclaims; however, this Court subsequently dismissed those counterclaims for lack of jurisdiction.

*See State Bank & Trust v. Boat "D.J. GRIFFIN",* 731 F.Supp. 770 (E.D.La.1990).

is specifically what kind of mortgages were created with respect to the two Boat Operators vessels. A final issue to be resolved is whether State Bank acted in bad faith, with malice, or gross negligence in seizing the two Boat Operators vessels.

### Findings of Fact

1. At all pertinent times, plaintiff, State Bank, was a Louisiana banking corporation, having its principal place of business in Lafourche Parish, Louisiana.

2. At all pertinent times, defendant, Boat Operators was a Louisiana corporation having its principal place of business in Lafourche Parish, Louisiana.

3. The M/V D.J. GRIFFIN, at all material times owned and operated by Boat Operators, is an offshore supply vessel measuring approximately 104 feet in length and bearing the official number 578168.

4. The M/V JOEY G, at all material times owned and operated by Boat Operators, is an offshore utility vessel measuring approximately 72 feet in length and bearing the official number 291880.

5. Boat Operators was formed as a Louisiana corporation on May 27, 1968. During the time of the events in question, on the books of the corporation, eight of the ten outstanding shares of the corporation were in the name of Derris Griffin and the remaining two shares were in the name of Elta Griffin. Elta Griffin subsequently acquired all outstanding shares and is presently the sole shareholder of the corporation.

6. On March 2, 1982, Elta Griffin and Derris Griffin were legally separated, thereby dissolving the community of acquets and gains existing between them. A judgment of divorce was rendered on March 29, 1984. There has been no partition of the community property.

7. At the time of the incorporation and at all times material herein, Derris J. Griffin and Elta C. Griffin were on the board of directors of Boat Operators.

8. The articles of incorporation of Boat Operators empowered the corporation, in carrying out its stated object and purposes, "to borrow money, and to issue from time to time, to any extent necessary and convenient in the opinion of the Board of Directors of this corporation, negotiable notes, coupons, registered or other bonds, or obligations of this corporation, and to secure the payment of the principal and interest on the same by mortgage or pledge of all or any part of the property, rights, franchises and privileges of the corporation then owned or which may thereafter be acquired by the corporation...."

9. By resolution dated November 3, 1969 ("1969 Resolution"), the board of directors of Boat Operators authorized Derris Griffin or Elta Griffin, in the name of and for the account of Boat Operators, to borrow any sum or sums of money from State Bank and to pledge and/or mortgage any property of Boat Operators *"to secure the payment of any indebtedness, liability or obligation of [Boat Operators] to said Bank ..."* (emphasis added). On November 3, 1969, Derris J. Griffin was President, Elta C. Griffin was Vice–President, and Janice G. Rebstock was Secretary–Treasurer of Boat Operators. State Bank had a copy of the 1969 Resolution in its files at all material times.

10. On January 31, 1977, a first preferred marine mortgage in the amount of $450,000 on the M/V D.J. GRIFFIN was executed by Derris Griffin, as president of Boat Operators, in favor of State Bank to secure an indebtedness evidenced by a promissory note dated January 31, 1977, in the sum of $450,000, bearing interest at the rate of 8% per annum ("ship mortgage no. 1").

11. Boat Operators executed a promissory note payable to the order of "ITSELF" dated January 31, 1977, in the sum of $450,000, bearing interest at the rate of 10% per annum, which was paraphed that same date *ne varietur* for identification with ship mortgage no. 1 ("mortgage note no. 1").

12. On June 30, 1977, a first preferred mortgage on the M/V JOEY G was executed by Derris Griffin, as president of Boat Operators, in favor of State Bank to secure an indebtedness evidenced by a promissory note dated January 31, 1977, in

the principal sum of $150,000, bearing interest at the rate of 8% per annum ("ship mortgage no. 2").

13. Boat Operators executed a promissory note payable to the order of "ITSELF" dated June 30, 1977, in the sum of $150,000, bearing interest at the rate of 10% per annum, which was paraphed that same date *ne varietur* for identification with ship mortgage no. 2 ("mortgage note no. 2").

14. On February 14, 1977, Boat Operators borrowed the sum of $582,000 from State Bank, which loan was secured by, among other collateral, a pledge of the $450,000 mortgage note no. 1, dated January 31, 1977. The purpose of this loan was to secure the funds necessary to pay for the construction of the M/V D.J. GRIFFIN.

15. Subsequently, the $150,000 mortgage note no. 2, dated June 30, 1977, was pledged to further secure the $582,000 loan.

16. The loan made on February 14, 1977, by State Bank to Boat Operators was paid in full on May 17, 1982.

17. The mortgages were both made by Boat Operators in favor of a particular creditor, State Bank. Both mortgages were for a specific debt. In addition, neither mortgage states that the notes which the mortgages secure were intended to be used to raise funds, nor was either made in favor of any future holder(s). Further, the mortgages do not contain language that the *ne varietur* note, paraphed for identification with it, was to be negotiated and might be placed as security for future obligations; nor do the mortgages contain language that the collateral notes could be issued and reissued without being extinguished.

18. The first preferred mortgages state as follows:

> PROVIDED, HOWEVER, that if Owner, his heirs, executors, administrators or its assigns shall perform and observe all and singular the terms, covenants and agreements herein, then this Mortgage shall cease, otherwise to remain in full force and effect.

19. The first preferred mortgage on the M/V JOEY G states that it secures an indebtedness "evidenced by a promissory Note dated January 31, 1977, in the principal sum of One Hundred Fifty Thousand and No/100 ($150,000.00) Dollars." There is no promissory note for $150,000 dated January 31, 1977. Rather, the $150,000 promissory note is dated the same date as the first preferred mortgage on the M/V JOEY G, June 30, 1977.

20. There was no separate written pledge agreement underlying either of these mortgage transactions.

21. The intent of the Griffins when the original pledge of the preferred mortgages took place was that the mortgages were not to secure future advances; rather, the mortgages were for a particular and specific debt, and that the funds evidenced by this debt were to be used to pay for the construction of the M/V D.J. GRIFFIN.

22. Derris Griffin Boat Rentals, Inc. ("Boat Rentals") was at all material times a corporate entity separate and distinct from that of Boat Operators, and whose stock was at all material times owned by Derris Griffin.

23. From December 16, 1981 to May 24, 1982, a series of nine unsecured loans were made by State Bank to Boat Rentals, resulting in an unpaid balance, on May 24, 1982, of $1,310,000. All proceeds from these loans were disbursed to, and for the benefit of, Boat Rentals. There is no evidence to suggest that any part of the proceeds of these loans was received by or benefitted Boat Operators in any way.

24. On April 13 and 19, 1982, Elta Griffin received reminders of past due payments of $9,500 and $90,000, respectively, from State Bank. State Bank had loaned these funds to Derris Griffin, purporting to act on behalf of Boat Operators, but without the knowledge of Elta Griffin. Said funds were never deposited into the corporate account of Boat Operators, nor did Boat Operators receive benefit from those funds.

25. After Elta Griffin discussed these past due notices, Note No. 35521 in the amount of $9,500 and Note No. 35234 in

the amount of $90,000, with Curtis Adams, a State Bank officer now deceased, both were marked "paid" on April 30, 1982. Boat Operators paid nothing to extinguish these debts. They were extinguished only by the request of Elta Griffin.

26. On several occasions prior to December 23, 1982, Elta Griffin informed James Alario, then President of State Bank, and Curtis Adams, then Senior or Executive Vice President of State Bank that there was a limitation upon the authority of Derris Griffin to borrow money or mortgage the property of Boat Operators. At no time was Elta Griffin told that State Bank was unaware of any such limitation upon the authority of Derris Griffin with regard to Boat Operators.

27. On December 23, 1982, Derris Griffin, as president of Boat Rentals (and as president of Big 3 Marine, Inc., a corporation also owned by Derris Griffin), executed a promissory note in the amount of $1,310,000 in favor of State Bank. The funds from the $1,310,000 loan were disbursed to pay the previous debts, as described in paragraph 23 above, of Boat Rentals and did not benefit Boat Operators in any way. As security for this debt of Boat Rentals, Derris Griffin purported to pledge both the $150,000.00 and the $450,000.00 mortgage notes described in paragraphs 11 and 13 above, which notes were further secured by first preferred marine mortgages on the M/V JOEY G and the M/V D.J. GRIFFIN, respectively. The above described mortgage notes were, at the time, unpledged and the vessels securing them were not otherwise encumbered.

28. State Bank had in its files a number of promissory notes which had been previously signed by Derris Griffin in blank.

29. Derris Griffin did not remember signing the December 23, 1982 Note at the same time as the accompanying allonge, which purported to pledge the mortgages described in paragraph 27 above. Mr. Griffin did not know the difference between a collateral and an ordinary mortgage. No one at State Bank ever explained this difference to him, nor did anyone at State Bank explain to Derris Griffin the terms of the December 23, 1982 Note.[2]

30. The sole basis for State Bank's acceptance of the pledge of the mortgage notes described in paragraphs 11 and 13 above for the debt of Boat Rentals and Big 3 Marine was the 1969 Resolution of Boat Operators. State Bank, through its officers and directors, had actual knowledge of said 1969 Resolution. State Bank had no reason to believe that Derris Griffin had actual or apparent authority in excess of that provided for by the specific language of the 1969 Resolution.

31. On August 17, 1984, the United States Marshal seized the M/V D.J. GRIFFIN at the United Diesel Dock, in Houma, Louisiana, and the M/V JOEY G at a dock in Bayou Lafourche near Mathews, Louisiana. Said seizures were based on the nonpayment of the promissory note in the amount of $1,310,000 made by Boat Rentals and Big 3 Marine, payable to the order of State Bank.

32. Edward T. Diaz was a member of the board of directors of State Bank. In addition, Diaz also acted as attorney for State Bank. In that capacity he signed and filed the original foreclosure pleadings to seize the M/V D.J. GRIFFIN and the M/V JOEY G.

33. On January 18, 1977, an initial Time Charter for the M/V D.J. GRIFFIN was entered into by and between Odeco Oil and Gas Company ("Odeco") and Boat Operators. The Time Charter was executed pursuant to a Master Service Contract by and between Odeco and Boat Operators, whereby Boat Operators, as contractor, supplied the M/V D.J. GRIFFIN as a manned time-chartered vessel to Odeco. The M/V D.J. GRIFFIN worked continuously from the time it was put into service until August 17, 1984, the date of its seizure by the United States Marshal. As of July 1, 1983, Odeco was paying $850 per day, 7 days per week for the vessel. At the time of its seizure, the M/V D.J. GRIFFIN was still on time charter to Odeco, but was undergoing engine repairs at United Diesel Dock in

---

**2.** An explanation of the terms of the note would have seemed appropriate since, as was apparent to the Court during Mr. Griffin's testimony, Derris Griffin could not read.

Houma, Louisiana. The board of State Bank was aware at this time that the M/V D.J. GRIFFIN was working under contract with Odeco.

34. On October 15, 1984, the M/V D.J. GRIFFIN and the M/V JOEY G were sold at public auction conducted by the United States Marshal. Said vessels were sold for $200,000 and $5,000 respectively and the funds were deposited into the registry of the Court.

### Conclusions of Law

1. This Court has jurisdiction over the claim and the counterclaim pursuant to 28 U.S.C. § 1333(1) and Rule 9(h) of the Federal Rules of Civil Procedure. Jurisdiction over the counterclaim also arises under ancillary jurisdiction as the counterclaim is compulsory. Venue is proper in this district.

2. The *Bangor Punta* doctrine is an equitable doctrine which denies stockholders the right to seek damages from former directors for corporate mismanagement when the claimants' stock was acquired by them with the knowledge of the prior misconduct. *Rivercity v. American Can Company,* 600 F.Supp. 908, 917 (E.D. La.1984), *aff'd,* 753 F.2d 1300 (5th Cir. 1985); *see Bangor Punta Operations, Inc. v. Bangor & Aroostook Railroad Company,* 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974).

3. Since the counterclaim is not an action against Derris Griffin as a former director of Boat Operators, the *Bangor Punta* doctrine is not applicable.

4. Each spouse owns an undivided one-half interest in all community property. La.Civ.Code Ann. art. 2336. Community property includes property acquired during the existence of the legal regime through the effort, skill, or industry of either spouse. La.Civ.Code Ann. art. 2338. Boat Operators, as well as several other Griffin companies were formed and incorporated during the existence of the marriage of Derris and Elta Griffin; therefore, the assets of all these companies were community property and, as such, both Derris and Elta Griffin each owned an undivided one-half interest in the assets of those compa-

nies until the date of the filing of their separation from bed and board on March 2, 1982. La.Civ.Code Ann. art. 2356.

5. Any ownership interest for purposes of community property, however, is distinct and separate from the ability to control a corporation. Because Elta Griffin was at all material times a stockholder and director of Boat Operators, and pursuant to the 1969 Resolution, control of that corporation in its dealings with State Bank, *i.e.,* borrowing money or encumbering assets, was governed by the 1969 Resolution, not by the law of community property.

6. Because of their nature and function, security devices should be strictly construed. *Durham v. First Guaranty Bank of Hammond,* 331 So.2d 563, 565 (La.App. 1st Cir.), *writ denied,* 334 So.2d 431 (La.1976); *see Thrift Funds Canal, Inc. v. Foy,* 242 So.2d 253, 256 (La.App. 4th Cir.1970), *aff'd,* 261 La. 573, 260 So.2d 628 (1972).

7. A mortgage is an accessory right which is granted to the creditor over the property of another as security for the debt. La.Civ.Code Ann. arts. 3278, 3284; *see First Guaranty Bank v. Alford,* 366 So.2d 1299, 1302 (La.1978).

8. Mortgages are of three types: conventional, legal and judicial. *Id.* (citing La.Civ.Code Ann. art. 3286). Within the area of conventional mortgages, three different forms are recognized by the Louisiana statutes and jurisprudence: (1) an ordinary mortgage; (2) a mortgage to secure future advances; and (3) a collateral mortgage. *Id.* (citations omitted).

9. An ordinary mortgage is a mortgage given to secure a particular, specific, existing debt. *Thrift Funds,* 260 So.2d at 630. A mortgage for future advances is a mortgage given to secure a debt not yet in existence. *Id; see* La.Civ. Code Ann. arts. 3292, 3293.

10. "Unlike the other two forms of conventional mortgages, a collateral mortgage is not a 'pure' mortgage; rather, it is the result of judicial recognition that one can pledge a note secured by a mortgage and

use this pledge to secure yet another debt." *First Guaranty*, 366 So.2d at 1302.

11. "A collateral mortgage indirectly secures a debt via a pledge. A collateral mortgage consists of at least three documents, and takes several steps to complete. First, there is a promissory note, usually called a collateral mortgage note or a 'ne varietur' note. The collateral mortgage note is secured by a mortgage, the so-called collateral mortgage. The mortgage provides the creditor with security in the enforcement of the collateral mortgage note." *Id.*

12. The collateral mortgage note differs from the mortgage to secure future advances in that money is not directly advanced on the note that is paraphed for identification with the act of mortgage. Instead, in a collateral mortgage situation, the collateral mortgage note and the mortgage which secures it are pledged to secure a debt. *Id.*

13. A collateral mortgage is a mortgage not intended to directly secure an existing debt, but to secure a mortgage note pledged as collateral security to raise funds, usually in the form of hand notes. This mortgage is usually drawn in favor of future holders, who are represented in the act by a nominal mortgagee. For convenience in pledging, the companion collateral mortgage promissory note ("mortgage note"), the payment of which the mortgage secures, is usually payable to bearer on demand. The mortgage note will also contain language allowing the maker to issue and reissue the note without the note being extinguished. *Thrift Funds*, 260 So.2d at 630; Nathan & Marshall, *The Collateral Mortgage*, 33 La.L.Rev. 497, 504–06 (1973).

14. The accepted method to connect the hand note to the security of the collateral mortgage is to designate on the face of the hand note that it is secured by the pledge of the mortgage note. *Durham*, 331 So.2d at 565. The pledge of a collateral mortgage note to secure an indebtedness is a contract. La.Civ.Code Ann. art. 3133. The pledge secures only that debt or debts contemplated in the contract between the pledgor and the pledgee. *Durham*, 331 So.2d at 565.

15. The ordinary mortgage is drafted to secure a specific debt to a specific named creditor, and the mortgage is identified with that debt, so that when the debt is paid, the mortgage expires. La.Civ. Code Ann. art. 3285. The rule is well settled in Louisiana jurisprudence that "when the mortgage is for a specific debt, payment extinguishes debt and mortgage, and the subsequent issue of the note will not revive the mortgage." *Mente & Co. v. Levy*, 160 La. 496, 107 So. 318, 320 (1926).

16. In the absence of a written act of pledge to the contrary, State Bank must prove by parole evidence whether the parties originally contemplated the mortgage notes would be pledged as security for future advances or for a particular debt. Nathan & Dunbar, *The Collateral Mortgage: Logic and Experience*, 49 La.L.Rev. 39, 50–51 n. 48 (1988).

17. The evidence showed that Boat Operators performed all the terms of the mortgage by paying the note. The original loan in the amount of $582,000 made on February 14, 1977, for which the ship mortgages and mortgage notes were created, was paid in full on May 17, 1982. Accordingly, the first preferred ship mortgages on the M/V JOEY G and the M/V D.J. GRIFFIN ceased to exist as of May 17, 1982.

18. There are five requirements that a lender must meet in order to secure future advances by collateral mortgage:

(1) The initial pledge must be properly confected;

(2) Each subsequent loan must be specifically secured by a pledge of the original collateral mortgage notes;

(3) The parties must mutually agreed at the time of the original pledge that the pledge will also secure obligations thereafter arising;

(4) The pledge collateral must have continuously remained in the hands of the pledgee; and

(5) The parties at all times must have acted in good faith.

*New Orleans Silversmiths, Inc. v. Toups*, 261 So.2d 252, 254 (La.App. 4th Cir.), *writ*

*denied,* 262 La. 309, 263 So.2d 47 (1972) (citing La.Civ.Code Ann. art. 3158).

19. State Bank and Derris Griffin did not act in good faith at all times, as evidenced by the blank signed promissory notes in the files of State Bank.

20. Mere retention of the thing pledged, *i.e.* the collateral mortgage note, does not determine the continued existence of the pledge. *First Guaranty Bank,* 366 So.2d at 1304 n. 4. Therefore, the fact that State Bank remained in possession of the mortgage notes in question does not indicate that the parties intended those mortgages to secure future advances.

21. One must look to the act of pledge in order to determine whether the parties contemplated using a mortgage to secure future advances; however, there was no separate written act of pledge in this case. *See Texas Bank of Beaumont v. Bozorg,* 457 So.2d 667, 674–75 (La.1984). Since there was no pledge agreement and no other evidence to indicate otherwise, the Court finds that the mortgages in question were not intended to secure future advances.

22. The first preferred ship mortgages and mortgage notes are ordinary mortgages. They were created to secure one specific debt, that being the original $582,000 loan made by Boat Operators in February of 1977. That loan was paid in full in May of 1982. Neither the mortgages nor the mortgage notes contain the proper language indicating that they were to be used to raise funds and could be issued and reissued. The intent of the parties was for these mortgages and mortgage notes to secure a specific debt. Once the debt was paid, the mortgages were extinguished; therefore, the notes pledged by Derris Griffin and reused by State Bank to secure the $1,310,000 hand note were not themselves secured by valid mortgages. Therefore, State Bank did not have a valid security interest in the M/V D.J. GRIFFIN and the M/V JOEY G.

23. A party seeking to enforce an alleged contract against a corporation is required to establish that the officer or agent with whom he contracted was in fact authorized to bind the corporation. *North*

*American Sales Alliance, Inc. v. Carrtone Laboratories, Inc.,* 214 So.2d 167, 172 (La. App. 4th Cir.), *writ denied,* 253 La. 57, 216 So.2d 306 (1968); *Graves v. Pelican Downs, Inc.,* 292 So.2d 297, 299 (La.App. 1st Cir.1974).

24. Under Louisiana law, any action taken in the name of a corporation that is unauthorized by the corporation cannot bind the corporation. *Marsh Investment Corp. v. Langford,* 490 F.Supp. 1320, 1324 (E.D.La.1980), *aff'd,* 652 F.2d 583 (5th Cir. Unit A Aug. 1981), *cert. denied sub nom., Pontchatrain State Bank v. Marsh Investment Corp.,* 454 U.S. 1163, 102 S.Ct. 1037, 71 L.Ed.2d 319 (1982).

25. The authority to act on behalf of a corporation can only be conferred by the charter or the bylaws of the corporation or by resolution of the board of directors. La.Rev.Stat.Ann. § 12:81(C)(8) (West 1969 & Supp.1990); *McKendall v. Williams,* 467 So.2d 1301, 1303 (La.App. 4th Cir.), *writ denied,* 469 So.2d 986 (La. 1985).

26. In order to hold Boat Operators liable on the mortgage notes secured by the marine mortgages on the M/V D.J. GRIFFIN and the M/V JOEY G, Derris Griffin must have had either actual or apparent authority of Boat Operators to pledge the mortgage notes for the debts of Boat Rentals. *Lilliedahl & Mitchel, Inc. v. Avoyelles Trust & Savings Bank,* 352 So.2d 781, 787 (La.App. 3rd Cir.1977).

27. "Actual express authority of corporate officers stems from statute, articles of incorporation, bylaws, or resolutions of board of directors." *Dunham v. Anderson–Dunham, Inc.,* 466 So.2d 1317, 1320–21 (La.App. 1st Cir.), *writ denied,* 472 So.2d 29 (La.1985).

28. When a corporate resolution authorizes a corporate officer to act as agent with respect to encumbering assets, borrowing money or disbursing money for the benefit of that corporation, that authority does not extend to permit the officer to act for his own benefit. *See Lilliedahl,* 352 So.2d at 787. General language in a corporate resolution following a recitation

of specific powers shall be construed and confined within the limitation of the specific powers named. *Williams v. United St. John's Grand Lodge*, 140 So.2d 206, 210 (La.App. 4th Cir.1962). If the power to donate is not specifically enumerated, donations of corporate funds by corporate officers are improper. This is true in part because there is no legal right to exercise such a power, and in part because the corporation does not receive any benefit therefrom. *See id.* Therefore, the Court finds that the 1969 Resolution did not give Derris Griffin actual authority to pledge the mortgage notes to secure the debts of Boat Rentals and Big 3 Marine because that resolution only authorized Derris Griffin to act on behalf of and for the benefit of Boat Operators.

■ 29. Apparent authority is a doctrine created by the courts to protect innocent third persons dealing in good faith with corporate officials where the corporation has taken such action or inaction as to justify a belief that the official has acted with authority. *Id.* The doctrine of apparent authority has two requirements: (1) the principal must make some form of manifestation to an innocent third party; and (2) the third party must rely reasonably on the purported authority of the agent as a result of the principal's manifestations. *Id.*

■ 30. The reasonableness of the third party's reliance is determined from all the facts and circumstances of the case. *Analab, Inc. v. Bank of the South*, 271 So.2d 73, 76 (La.App. 4th Cir.1972). However, a third party seeking to benefit from the doctrine of apparent authority may not blindly rely on the assertions of an agent. He has a duty to inquire into the nature and extent of the agent's power. *Boulos v. Morrison*, 503 So.2d 1, 3 (La.1987).

■ 31. The Court finds that State Bank did not meet its burden of proof. Derris Griffin was not clothed with the apparent authority to pledge the mortgage notes to secure the debts of Boat Rentals and Big 3 Marine. In particular, the Court finds that because of the relationship which existed between Derris Griffin and State Bank, and because of State Bank's reliance upon the 1969 Resolution, and because of the presence of the signed blank promissory notes in the files of State Bank, State Bank was not an innocent third party nor did it reasonably rely on Derris Griffin's assumption of authority to pledge the property of Boat Operators to secure the debts of Boat Rentals and Big 3 Marine.

■ 32. Ratification is the adoption by one person of an act done on its behalf by another without authority. It amounts to a substitute for prior authority. *First National Bank of Shreveport v. Crawford*, 455 So.2d 1209, 1215 (La.App. 2nd Cir.), *writ denied*, 459 So.2d 538 (La.1984).

■ 33. A ratification occurs when personnel with the authority to bind the corporation acquire knowledge of the unauthorized act and thereafter fail to repudiate it within a reasonable period of time. *3 A's Towing Co. v. P & A Well Service, Inc.*, 642 F.2d 756, 758–59 (5th Cir.Unit A April 1981). The burden of proving ratification is on the party asserting it. *Tyson v. Robinson*, 329 So.2d 781, 783 (La.App. 2nd Cir.1976); *McCurnin v. Kohlmeyer & Co.*, 477 F.2d 113, 115 (5th Cir.1973).

■ 34. The Court finds that Boat Operators did not ratify Derris Griffin's act of pledging the mortgage notes to secure the debts of Boat Rentals and Big 3 Marine. In particular, the Court finds that after personnel with authority to bind Boat Operators acquired knowledge of Derris Griffin's unauthorized act, said personnel: (1) informed State Bank that Derris Griffin had acted beyond his authority; (2) did not make any payments on the $1,310,000 note secured by the pledge of the mortgage notes; and (3) contacted legal counsel to pursue the protection of the corporation's rights.

■ 35. Equitable estoppel is defined as the effect of the voluntary conduct of a party which should preclude him from asserting rights against another because the other party has justifiably relied upon such conduct and changed his position so that he will suffer injury if the former is allowed to repudiate the conduct. The general rule is that estoppel is not favored. One must affirmatively show that he was

misled and acted to his prejudice in order to prevail in a defense of equitable estoppel. *Wilkinson v. Wilkinson,* 323 So.2d 120, 126 (La.1975); *Lilly v. Angelo,* 523 So.2d 899, 903–04 (La.App. 4th Cir.), *writ denied,* 526 So.2d 1120 (La.1988). Because of the 1969 Resolution and Elta Griffin's oral notifications to State Bank that Derris Griffin was exceeding his corporate authority, State Bank was not misled by the conduct of Boat Operators and may not rely on the defense of equitable estoppel.

36. Because the mortgage notes were not properly pledged, State Bank did not hold a valid security interest in the M/V D.J. GRIFFIN and the M/V JOEY G.

37. In admiralty, the gravamen of the right to recover damages for wrongful seizure or detention of vessels is the bad faith, malice, or gross negligence of the offending party. *Frontera Fruit Co., Inc. v. Dowling,* 91 F.2d 293, 297 (5th Cir.1937).

38. The Court finds that State Bank wrongfully seized the M/V D.J. GRIFFIN and the M/V JOEY G. State Bank acted in bad faith and was grossly negligent in allowing Derris Griffin to encumber the assets of Boat Operators for the benefit of other corporations. State Bank and its board of directors knew that Derris Griffin did not have the authority to endorse the December 23, 1982 hand note and mortgage and/or pledge Boat Operators' vessels to secure the debts of Boat Rentals and Big 3 Marine. First, the 1969 Resolution clearly limited Derris Griffin's authority to encumber the assets of Boat Operators only for the benefit of Boat Operators, not for other corporations. Second, Elta Griffin orally notified State Bank on more than one occasion that Derris Griffin was acting beyond the scope of his corporate authority. In addition, the presence of the signed blank promissory notes in the files of State Bank further indicate State Bank's bad faith. Furthermore, after Elta Griffin complained to State Bank about past due notices on the $9,500 and $90,000 notes discussed above, those notes were canceled within days, a further recognition by State Bank that State Bank knew Derris Griffin was exceeding his corporate authority.

*Damages*

1. The Court finds that the seizure and sale of the M/V JOEY G caused Boat Operators to suffer losses in the amount of $200,000.00, measured as the fair market value of the vessel at the time it was seized.

2. The Court finds that the seizure and sale of the M/V D.J. GRIFFIN caused Boat Operators to suffer losses in the amount of $960,000.00. This loss is due to lost profits pursuant to the time charter and master service contract by and between Odeco and Boat Operators. The Court believes there was competent testimony to estimate with reasonable certainty lost profits to Boat Operators as a result of the wrongful seizure of the M/V D.J. GRIFFIN at $80,000.00 per year for twelve years, the remaining useful life of the vessel at the time it was seized.

3. State Bank has been found to have acted with bad faith and gross negligence; therefore, Boat Operators is entitled to an award of reasonable attorney's fees. *Vaughan v. Atkinson,* 369 U.S. 527, 530, 82 S.Ct. 997, 999, 8 L.Ed.2d 88 (1962); *Frontera Fruit Co. v. Dowling,* 91 F.2d 293, 297 (5th Cir.1937); *Cardinal Shipping Corp. v. M/V SEISHO MARU,* 744 F.2d 461, 474 (5th Cir.1984).

4. As a general rule, prejudgment interest should be awarded in admiralty cases, absent "peculiar circumstances." *Noritake Co., Inc. v. M/V HELLENIC CHAMPION,* 627 F.2d 724, 728–29 (5th Cir.1980). There are no peculiar circumstances in this case; therefore, Boat Operators is entitled to prejudgment interest, said interest to run from the date the vessels were seized. *See Ryan Walsh Stevedoring Co. v. James Marine Services, Inc.,* 792 F.2d 489, 492–93 (5th Cir.1986).

Accordingly,

IT IS ORDERED that judgment be entered in favor of the plaintiff-in-counterclaim, Elta Griffin derivatively for the benefit of and on behalf of Derris Griffin Boat Operators, Inc., and against the defendant-in-counterclaim, State Bank & Trust Company of Golden Meadow in the sum of

$1,160,000.00 less the net proceeds held in the registry of the Court, plus costs and interest at the legal rate to run from August 17, 1984 until paid, plus reasonable attorney's fees.

IT IS FURTHER ORDERED that the matter of attorney's fees is hereby RE-FERRED to the magistrate for an evidentiary hearing, if necessary, to determine the reasonableness of said fees, with the magistrate to prepare a report and recommendation on that issue for the Court.