**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 97-31275

_____

In the Matter of:
LLOYD C. CHARRIER; BARBARA T. CHARRIER,

Debtors

_____

LLOYD C. CHARRIER; BARBARA T. CHARRIER

Appellants,

versus

SECURITY NATIONAL OF OREGON,

Appellee.

_____

Appeal from the United States District Court
for the Middle District of Louisiana

_____

February 18, 1999

Before SMITH, DUHÉ and WIENER, Circuit Judges.

WIENER, Circuit Judge:

In this bankruptcy case, Plaintiffs-Appellants Lloyd and Barbara Charrier appeal the judgment of the district court affirming the bankruptcy court's holding that a 1979 collateral mortgage encumbering a parcel of their community property is valid, and that Security National of Oregon ("SNO") is entitled to the balance due on two promissory notes secured by that mortgage. Concluding that the bankruptcy court's holding is correct, we

affirm.


**I**

**FACTS AND PROCEEDINGS**

On January 3, 1979, Lloyd and Barbara Charrier executed a promissory note (the "collateral mortgage note") in the amount of $200,000, paraphed <u>ne varietur</u> for identification with a 1979 act of mortgage (the "collateral mortgage") on community immovables ⸺ a 13 acre tract of land and the improvements on it, including the couple's personal residence ⸺ in Walker, Louisiana. The Charriers pledged the collateral mortgage note and collateral mortgage to Livingston State Bank ("LSB") to secure another promissory note (the "hand note") which represented the actual loan to the Charriers from LSB. There is no evidence in the record as to the precise amount actually owed on the hand note, but it appears that the Charriers satisfied this obligation in August of 1979.[1]  It also appears from the record that ⸺ as indicated by the bankruptcy court ⸺ the Charriers had executed a written Act of Pledge, although what became of that document is unknown.

On August 11, 1982, Mr. Charrier took out another loan with LSB, evidenced by a new hand note.  At the time of this

---

[1]At trial, the Charriers claimed that they made their last payment in August 1979.  SNO was unable to obtain the payment records on the original loan to dispute this point.

transaction, Mr. Charrier, but not his wife, signed a new Act of Pledge that pledged the original $200,000 collateral mortgage note and collateral mortgage. As additional security for the 1982 loan, Mr. Charrier pledged another collateral mortgage note and collateral mortgage, encumbering three different parcels of community immovable property. One week later, on August 18, 1982, Mrs. Charrier executed a power of attorney, making Mr. Charrier her agent and attorney-in-fact. Pursuant to this authority, Mr. Charrier could "make . . . and endorse promissory notes"; "pledge . . . all or any part or parts" of her property; "encumber, hypothecate or mortgage all or any part or parts of the property belonging to [Mrs. Charrier]" and "consent and agree to all privileges, mortgages and pledges in favor of, or against, [Mrs. Charrier] that may be required and necessary."

On September 18, 1985, and December 4, 1985, Mr. Charrier executed two more hand notes payable to LSB, one in the amount of $360,305.44 and the other in the amount of $15,000. Each note indicated that it was secured by three separate collateral pledge agreements, two of which were dated in 1984, and the other of which was dated September 18, 1985. The 1985 pledge agreement is the one that expressly repledged the 1979 collateral mortgage note and collateral mortgage.

LSB continuously possessed the 1979 collateral mortgage note until the bank went into receivership in 1992. At that time, the

3

Federal Deposit Insurance Corporation ("FDIC"), as receiver for LSB, sold all three hand notes from 1982 and 1985, together with their collateral — including the 1979 collateral mortgage note and collateral mortgage — to Security National #4, from which SNO subsequently purchased these instruments in 1994.

In November 1996, the Charriers sought protection under Chapter 7 of the Bankruptcy Code. On February 3, 1997, SNO filed an adversary complaint in the bankruptcy court seeking a judgment against the Charriers for the balances due on the two 1985 hand notes and recognition of the 1979 collateral mortgage as security for these notes.

Following a trial on the merits, the bankruptcy court denied the Charriers' discharge, entered judgment in favor of SNO on the two notes, and recognized the 1979 collateral mortgage as valid and subsisting. In its oral reasons for judgment, the bankruptcy court noted that, even though SNO could not locate the original or a copy of the 1979 collateral pledge agreement, there was sufficient evidence in the record to reflect that one had existed. And, because LSB had continuous possession of the collateral mortgage note from 1979 to 1992, reasoned the court, it could be presumed that the parties intended for the pledged collateral mortgage note and collateral mortgage to secure future advances. Consequently, the court concluded, when LSB granted a new loan to the Charriers in 1982 — within five years of the original Act of Pledge — this

4

loan was automatically secured by the 1979 collateral. Likewise, the two loans made by LSB in 1985 constituted future advances secured by the subject collateral pledges. As such, payments made on these three loans interrupted prescription on the collateral mortgage note and preserved the collateral mortgage.

Assuming, in the alternative, that the parties did not contemplate future advances in their original pledge, the bankruptcy court concluded that the collateral mortgage was nevertheless valid because Mr. Charrier had repledged the 1979 collateral mortgage note in 1982. The court reasoned that when Mrs. Charrier granted the power of attorney to her husband just days after the pledge, her act was sufficient to ratify his encumbrance of the community property. Finally, concluded the court, even if the 1979 collateral mortgage note had prescribed, the Charriers made a valid pledge in 1985 of a natural obligation under Louisiana Civil Code article 3139, and thereby revived the collateral mortgage.

The Charriers appealed to the district court, which affirmed solely on the basis that the debtors had repledged the 1979 collateral mortgage note.[2] The court reasoned that Mrs. Charrier's

---

[2]The district court did not address the bankruptcy court's theory that LSB's retention of the pledged note provided automatic security for future advances. Furthermore, the district court found it unnecessary to reach the bankruptcy court's alternative conclusion that the Charriers made a valid pledge of a natural obligation.

5

1982 power of attorney not only vested her husband with express authorization to grant future mortgages on their community property, but also ratified the encumbrance Mr. Charrier made without her concurrence on August 11, 1982. By repledging the 1979 collateral mortgage note and remitting payment on the 1982 hand note, concluded the court, the Charriers interrupted prescription and preserved the collateral mortgage. The Charriers timely filed a notice of appeal.

## II

### ANALYSIS

**A.    Standard of Review**

Although this case has already been reviewed on appeal by the district court, we review the bankruptcy court's ruling as though this were a direct appeal to us.[3] We thus review the bankruptcy court's findings of fact under the clearly erroneous standard, and its conclusions of law de novo.[4]

**B.    Applicable Law**

In a typical Louisiana collateral mortgage transaction, the borrower contemporaneously executes a promissory note (known as a collateral mortgage note) and an act of mortgage (known as a collateral mortgage). In this latter instrument, the mortgagor

---

[3]Texas Lottery Comm'n v. Tran (In re Tran), 151 F.3d 339, 342 (5th Cir. 1998).

[4]Id.

6

acknowledges his indebtedness and states his intent to pledge the collateral mortgage note, which is secured by the collateral mortgage, as security for the advancement of funds. The collateral mortgage note is customly made payable on demand, to "Bearer" or "Myself" or "Any Future Holder," and is "paraphed" for identification with the mortgage.[5] This collateral mortgage package is then delivered by the borrower in pledge to the lender to secure an indebtedness which is usually represented by a separate "hand note."[6] A collateral mortgage note prescribes five years from the date of its execution unless prescription is interrupted by acknowledgment or by partial payment on the indebtedness it secures.[7]

The pledge of a collateral mortgage note and collateral mortgage to secure a debt is a contract.[8] The pledge secures only the debt or debts contemplated in the act of pledge between the pledgor and the pledgee.[9] A collateral mortgage package may be pledged to secure particular debts, either previously existing or

---

[5]First Guar. Bank v. Alford, 366 So. 2d 1299, 1302 (La. 1978).

[6]Texas Bank of Beaumont v. Bozorg, 457 So. 2d 667, 671 (La. 1984).

[7]La. R.S. 9:5807; Kaplan v. University Lake Corp., 381 So. 2d 385, 390-91 (La. 1979). On prescription of the collateral mortgage note, the underlying collateral mortgage is lost, and the hand note remains as a purely personal obligation of the borrower. Id.

[8]La. Civ. Code art. 3133.

[9]Alford, 366 So. 2d at 1304; Durham v. First Guar. Bank of Hammond, 331 So. 2d 563, 565 (La. Ct. App. 1st Cir. 1976).

7

contracted contemporaneously with the pledge, or future loans by the pledgee to the pledgor —— or both —— up to the limits of the pledge.[10]

As a general rule, Louisiana law does not require a written pledge agreement because the pledge of a promissory note is confected by mere delivery.[11] To secure future advances, however, a creditor must prove that the parties intended for the original collateral mortgage note to be used for this purpose.[12] At one time, it was generally agreed that, as long as a creditor retained possession of the pledged note, he could rely on standard future advance language contained in a collateral mortgage to establish

---

[10]Bozorg, 457 So. 2d at 672; La. Civ. Code art. 3158 (amended 1989).

[11]La. Civ. Code art. 3158 (amended 1989). This article provided in pertinent part:
> When a debtor wishes to pledge promissory notes . . . he shall deliver to the creditor the notes . . . and such pledge so made . . . shall without further formalities be valid as well against third persons as against the pledgor thereof, if made in good faith . . . . All pledges may be made by private writing of any kind if only the intention to pledge be shown in writing, but all pledges . . . must be accompanied by actual delivery.

See Pontchartrain State Bank v. Gross, 508 So. 2d 901, 903 (La. Ct. App. 5th Cir. 1987); Plumbing Supply House, Inc. v. Century Nat'l Bank, 440 So. 2d 173, 175 (La. Ct. App. 4th Cir. 1983). The 1989 amendment did not alter the above quoted language.

[12]La. Civ. Code art. 3158 (amended 1989); New Orleans Silversmiths, Inc. v. Toups, 261 So. 2d 252, 255 (La. Ct. App. 4th Cir. 1972); State Bank & Trust Co. of Golden Meadow v. Boat D.J. Griffin, 755 F. Supp. 1389, 1398 (E.D. La. 1991).

8

the parties' requisite intent.[13]  Under this theory, full payment of a debtor's principal obligation would not extinguish the collateral mortgage note and accompanying mortgage.[14]  As long as the pledged collateral mortgage note had not prescribed, subsequent advances would be secured automatically.

Following the Louisiana Supreme Court's 1984 decision in Texas Bank of Beaumont v. Bozorg, however, this area of law has become a bit murky.[15]  In Bozorg, the court "emphasized" in a footnote that evidence of the parties' intent to secure future advances "must be in the contract of pledge and not in the collateral mortgage instrument."[16]  This is so, explained the court, because "the pledgee is generally not a party to the collateral mortgage instrument, and the instrument is frequently executed prior to a contract of pledge."[17]  In light of Bozorg, it is now unclear how, if at all, a creditor can prove intent in the absence of a written

_____

[13]See Alford, 366 So. 2d at 1302-03; Acadiana Bank v. Foreman, 352 So. 2d 674, 676-77 (La. 1977).  Max Nathan, Jr. & Anthony P. Dunbar, The Collateral Mortgage: Logic and Experience, 49 La. L. Rev. 39, 57 (1988).

[14]Alford, 366 So. 2d at 1302.

[15]457 So. 2d 667 (La. 1984).

[16]Id. at 674 n.10.

[17]Id.  We note the presence on the 1979 act of mortgage of the signature of a person designated as representing "Any Future Holder or Holders" of the collateral mortgage note.  It is not clear, however, from either the mortgage itself or the record, whether this signatory was a representative of LSB.

pledge agreement.[18]

If a creditor cannot prove intent to secure future advances, the collateral mortgage becomes dormant when a debtor's principal obligation is extinguished, even if the creditor retains physical possession of the collateral mortgage note.[19]   To activate the collateral mortgage, the debtor must repledge the collateral mortgage note, before it prescribes, as security for a new loan.

In sum, absent proof that the parties intended to secure future obligations or that the obligor on a collateral mortgage note subsequently repledged it, mere retention of the collateral mortgage note after extinguishment of the original hand note does not give a creditor a continuing security interest.[20]

The Charriers base their challenge of the bankruptcy court's holding that the 1979 collateral mortgage was valid and subsisting on the ground that their intent to secure future advances has not been proven.[21]   Indeed, argue the Charriers, in the absence of a

---

[18]See Nathan & Dunbar, Logic and Experience, 49 La. L. Rev. at 58.

[19]Alford, 366 So. 2d at 1303.

[20]Id.

[21]The Charriers also argue that, contrary to the conclusion reached by the bankruptcy court, Mr. Charrier was prohibited under Louisiana community property law from repledging the 1979 note without Mrs. Charrier's concurrence, and that Mrs. Charrier did not ratify the 1982 repledge.  Because we affirm the bankruptcy court's holding on other grounds, however, we find it unnecessary to address any of the alternative theories on which the court based its ruling.

written pledge agreement specifically authorizing the use of the 1979 collateral mortgage note to secure future indebtednesses, the mere physical retention of the note by LSB was insufficient to preserve the mortgage on their property.  We disagree.

We acknowledge that, in the wake of Bozorg, it may be quite difficult to prove intent absent a written pledge agreement, but the bankruptcy court found ample evidence in the record of the existence of such a document, and so do we.[22]  The Charriers are correct in stating that the actual 1979 pledge document was never located.  Nevertheless, a plethora of commercial loan memoranda referring to a 1979 "CPA" —— or collateral pledge agreement —— was introduced at trial.  In addition, a former bank president and a loan officer testified regarding LSB's longstanding practice of always obtaining pledge agreements using the same standard form as those obtained by the bank from Mr. Charrier in 1982 and 1985.  Both of these later agreements contain express language granting the bank a security interest in the 1979 collateral mortgage note for all existing and future indebtednesses.[23]  In light of this

_____

[22]Under La. Civ. Code. art. 1832, the existence of a written contract may be proved by testimony or presumption when the written instrument has been destroyed, lost, or stolen.

[23]The pledge agreements obtained by the bank in 1982 and 1985 provide in pertinent part:

As an inducement to LIVINGSTON STATE BANK & TRUST CO. (hereinafter referred to as "Bank") to extend credit to the undersigned (whether one or more) from time to time, the undersigned herein and hereby agree that:

11

evidence, the bankruptcy court was satisfied that such a pledge agreement had also been executed in connection with the 1979 transaction. The Charriers have made no attempt to rebut this finding, and we see nothing in the record to persuade us that it was clearly erroneous.

We further note in passing that the act of collateral mortgage signed by Mr. and Mrs. Charrier in 1979 contains language that specifically authorized future advances.[24] This, together with the Charriers' failure to retrieve the collateral mortgage note or seek

---

> a. All promissory notes executed by the undersigned or any one or more of them to the order of Bank, in principal, interest and attorney's fees, as therein stipulated, and all extensions and/or renewals thereof; and
>
> b. Any and every other debt, liability and obligation, direct or indirect, absolute or contingent, liquidated or unliquidated, due or to become due, whether now existing or hereafter arising, of the undersigned, or any one or more of them, to Bank;
>
> up to the sum, in aggregate, of . . . , at any one time outstanding, are and shall be secured by the pledge of all securities and/or property listed and described . . . .

[24]Specifically, the collateral mortgage provides:

> The above described note is given and this mortgage is granted for the purpose of being used as collateral security by MORTGAGOR for any indebtedness due the holder of the note, direct or contingent. <u>The note may be issued and pledged by MORTGAGOR as his interest and convenience may require to secure loans and advances made or to be made or to secure the debt of the maker or of another</u>. (Emphasis added).

12

its cancellation after paying off the original debt represented by the original hand note, and their repeated willingness to accept new loans based on the purported pledge of the 1979 collateral mortgage package, are clear indicators of the Charriers' intent to secure future indebtednesses with that collateral. As this intent was also evidenced in the original contract of pledge, we are convinced that the monies received by the Charriers after 1979 were secured future advances. For the foregoing reasons, the ruling of the bankruptcy court, as previously affirmed by the district court, is in all respects,

AFFIRMED.