LOURIE, Circuit Judge.
 

 Institut Pasteur and Genetic Systems Corporation (collectively “appellants”) appeal from the decisions of the United States District Court for the District of Massachusetts in their patent infringement suit against Cambridge Biotech Corporation (“Cambridge”). Appellants first appeal from the district court’s affirmance of the bankruptcy court’s denial of their motion to dismiss certain portions of Cambridge’s “Answer and Counterclaim” under Rule 19 of the Federal Rules of Civil Procedure.
 
 See Institut Pasteur v. Cambridge Biotech Corp. (In re Cambridge Biotech Corp.),
 
 212 B.R. 10, 15-19 (D.Mass.1997);
 
 Institut Pasteur v. Cambridge Biotech Corp.,
 
 No. 95-40189-NMG (D.Mass. Aug. 26, 1997) (order of dismissal). Second, appellants appeal from the district court’s affirmance of the bankruptcy court’s grant of summary judgment that Cambridge does not infringe Institut Pasteur’s U.S. Patents 5,055,391 and 5,051,496 because these patents were licensed to Cambridge under a cross-lieénsing agreement.
 
 See id.
 
 Third,. appellants appeal from the district court’s affirmance of the bankruptcy court’s determination .of a
 
 1%
 
 royalty rate as damages for past infringement and as compensation for future practice of the invention of Institut Pasteur’s U.S. Patent 5,217,861.
 
 See Institut Pasteur,
 
 212 B.R. at 19-21;
 
 Institut Pasteur v. Cambridge Biotech Corps (In re Cambridge Biotech Corp.),
 
 No. 96-40025-NMG (D.Mass. Aug. 26, 1997) (order of dismissal). ■ Finally, appellants appeal from the district court’s August 15, 1997 informal order denying its motion requesting a jury trial. Cambridge cross-appeals, urging that we dismiss appellants’ appeal under the equitable mootness doctrine. We affirm all of the district court’s rulings appealed by appellants and thus do not reach the issue raised by Cambridge’s cross-appeal. '
 

 BACKGROUND
 

 A.
 
 The Patents
 

 The three patents at issue, all of which are assigned to Institut Pasteur, are directed to structural components of and methods of detecting the presence of two types of Human. Immunodeficiency Virus (“HIV”), HIV-1 and the less common HIV-2. Infection with either type of HIV leads to Acquired Immune Deficiency Syndrome (“AIDS”), and thus assays that can detect HIV-1 and HIV-2 are crucial to diagnosing, treating, and arresting the spread of AIDS. The ’861 patent generally pertains to certain HIV-1 peptides (amino acid sequences which comprise part of the structure of the virus) and methods for detecting the presence of HIV-1. The ’391 patent is directed to diagnostic assays for detecting the presence of HIV-2, and the ’496 patent claims a number of structural peptides of HIV-2. The issues central to this appeal focus on the interpretation
 
 *1361
 
 of licensing agreements that govern these patents, not on the claims or any other aspect of the patents themselves.
 

 B.
 
 The Parties and Related Companies
 

 1. Instituí Pasteur, Genetic Systems Corporation, and Related Entities
 

 '
 
 Instituí Pasteur is a scientific research institute headquartered in Paris, France, that specializes in biochemical and biomedical research. Instituí Pasteur is among the world’s premier institutions involved in HIV research. Genetic Systems Corporation, a biotechnology company located in the United States, acquired via license exclusive rights in the United States under the ’861, ’391, and ’496 patents, including the right to bring suit for infringement. These patents are enmeshed in a complex web of licensing and cross-licensing agreements that have prompted the present dispute. , To interpret these agreements, one must understand the corporate structures of which both Instituí Pasteur and Genetic were a part during the time period in question.
 

 During the relevant time period, Instituí Pasteur and the French corporation Sano-fi, S.A. owned nearly all of the stock (26% and 72%, respectively) of the company Pasteur Sanofi Diagnostics (“PSD,” formerly known as Diagnostic Pasteur). PSD, in turn, wholly owned its subsidiary, Sanofi Diagnostics Pasteur (“SDP,” formerly known as Kallestad Diagnostics). SDP ultimately acquired all of the stock of Genetic following a sequence of ownership changes in which: (1) Bristol-Myers transferred all of the outstanding capital stock of Genetic to Elf Sanofi, Inc., a subsidiary of Sanofi, S.A., and (2) Elf Sanofi, Inc. transferred this stock to SDP. In net effect, PSD ultimately owned all of the stock of SDP, which owned all of the stock of Genetic.
 

 2.
 
 Cambridge Biotech Corporation
 

 Cambridge Biotech Corporation (formerly known as Cambridge Bioscience Corporation) is a biotechnology company that manufactures and sells diagnostic kits for detecting the presence of HIV. Its facilities .are located in Worcester, Massachusetts and Rockville, Maryland. On July 7, 1994, Cambridge filed a voluntary petition for bankruptcy under Chapter 11 of the United States Bankruptcy Code. Pursuant to its reorganization plan, Cambridge sold its stock to bioMérieux Vitek, a subsidiary of bioMérieux, S.A.
 

 C.
 
 The Licensing Agreements
 

 1.
 
 The 1989 Agreement
 

 Regarding the ’391 and ’496 patents (the HIV-2 patents), the dispute centers on a cross-licensing agreement entered into by Cambridge and PSD on October 25, 1989 (the “1989 Agreement”). Instituí Pasteur had received an assignment of these patents from the inventors, and Instituí Pasteur had granted an exclusive license, with the right to sublicense, to PSD. Under the 1989 Agreement, each party granted to the other licenses under various patents; significantly, at the time the 1989 Agreement was signed, PSD had no right to grant licenses under the ’391 and ’496 patents, as it had exclusively sublicensed the patents to Genetic pursuant to a 1984 joint venture agreement which created Blood Virus Diagnostics (the BVD Agreement). Under ¶ 2.2 of the 1989 Agreement, however, PSD agreed to make “best efforts” to recover that right from Genetic. Paragraph 2.2 provided that:
 

 2.2. The license granted to CBS [Cambridge] by DP [PSD] under paragraph 2.1 shall be automatically extended under the Licensed Patents as defined herein and as enclosed in Exhibit C upon recovery by DP [PSD] from GENETIC SYSTEMS of the right to practice DP’s [PSD’s] letterfs] patent included in Exhibit C [including the ’391 and ’496 patents], which DP [PSD] shall use its
 
 best efforts
 
 to recover. DP [PSD] represents that it is currently discussing such recovery with GENETIC SYSTEMS and will inform CBS [Cam
 
 *1362
 
 bridge] with the progress and results of such discussions.
 

 Joint App. at A1274 (emphasis added).
 

 After PSD’s wholly-owned subsidiary, SDP, acquired Genetic, Cambridge believed that PSD had in fact" satisfied its obligation to use “best efforts” to recover the right to sublicense the ’391 and ’496 patents. Accordingly, Cambridge forwarded royalties from its sale of HIV-2 products using the ’391 and ’496 subject matter to PSD. PSD refused to accept the royalties, arguing that Cambridge had no license to the patents and maintaining that it reserved the right to proceed against Cambridge.
 

 2.
 
 The 1987 Agreement
 

 Regarding the ’861 patent, the “1987 Agreement” is of central importance. On March 30, 1987, Institut Pasteur, the United States Department of Health and Human Services (“HHS”), and the National Technical Information Services of the United States Department of Commerce (“NTIS”) entered into an agreement entitled “Settlement Agreement” to resolve a dispute between AIDS researchers from France (led by Dr. Luc Montagnier from Institut Pasteur) and the United States (led by Dr, Robert Gallo from HHS) involving discovery of the HIV virus and certain HIV technology that arose from that work. The parties agreed,
 
 inter alia,
 
 that researchers associated with Montagnier and Gallo had concurrently isolated HIV and developed a diagnostic assay to detect the presence or absence of antibodies to the virus. The parties cross-licensed each other on a world-wide, royalty-free basis, including the right to sublicense, with or without royalties, the existing technology embodied within the claims of>a pending Institut Pasteur patent application, as well as an HHS patent and applications.'
 

 Under § 2 of the 1987 Agreement, the parties also agreed to cross-license “improvement technology,” which consisted of certain patents and patent applications belonging to Institut Pasteur and HHS. Included in this improvement technology was Institut -Pasteur’s application Serial No. 914,156, of which the ’861 patent is a continuation. Section 2 reads in relevant part:
 

 2. Licensing Improvements to Existing Technology
 

 [¶ 1] Each party agrees that any patent rights covering Improvement Technology that it owns or may own shall be made available to any current licensee of the other Party, -as denoted in Attachment A or Attachment B, as the case may be,- and to such additional licensees of either Party that may be granted a license from time to time under the Gallo et al. Patent or Montagnier et al. Application.
 

 [¶ 2] Improvement Technology made available under this ... [section] ... by one Party to the licensees of the other ' Party shall be made available by the licensor at a royalty rate: and under conditions no less favorable than those "offered to its own licensees.
 

 [¶ 3] For purposes of ensuring that a royalty rate charged a licensee of one Party for Improvement Technology is “no less favorable” than that offered to current licensees of the other Party, the Parties agree that in the event that a •Party licenses Improvement Technology to one or more of its licensees under the Gallo et al. Patent or Montagnier et al. Application, and as a result of such licensing reduces the royalty rate it charges on the existing Gallo et al. Patent or Montagnier et al. Application so that such royalty rate is less than the “existing royalty rate,” then (i) such a reduction shall be accompanied by a royalty-bearing agreement with -such licensee (or licensees) which bears an aggregate royalty (existing technology plus Improvement Technology) which is no less than, the royalty rate it had been • charging that licensee (or those licensees) for the underlying license prior to said reduction, and (ii).such Party shall offer the -licensees of the other Party a license for the Improvement Technology
 
 *1363
 
 at a royalty no greater than the difference between the largest aggregate royalty rate charged its own licensees and the “existing royalty rate.”
 

 [¶ 4] In the event that a Party has not yet licensed to any of its own licensees the Improvement Technology requested by a licensee of the other Party, then that Party shall offer a license to said licensee of the other Party under terms and conditions that would normally pertain if it were licensing such technology to one of its own licensees and further, that Party may establish a reasonable royalty rate for such Improvement Technology and charge that royalty rate to the other Party’s licensees. In such event, the Party shall charge that royalty rate to any of its own licensees subsequently requesting such Improvement Technology and upon licensing such Improvement Technology to the Party’s own licensees, may not reduce the existing royalty rate on the existing Gallo et al. Patent or Montagnier et al. Application ....
 

 [¶ 6] For purposes of this ... [section], ... the Parties agree that the “existing royalty rate” is five percent (5%) of net sales unless otherwise indicated in Attachment A or Attachment B.
 

 See
 
 Joint App. at A1863-65. Significantly, for the time period at issue here, Institut Pasteur licensed the relevant technology to Genetic, via PSD, at a royalty rate of 6%
 
 [1]
 

 On February 1, 1989, NTIS licensed to Cambridge certain United States patents and related foreign patents and applications directed to methods of detecting the presence of antibodies to HIV. As an NTIS licensee, Cambridge sought the benefit of § 2 of the 1987 Agreement with, respect to the ’861 patent, arguing that Institut Pasteur was obligated to license the ’861 patent to licensees of NTIS. Appellants do not, presently dispute that Cambridge is in fact entitled to a license under the 1987 Agreement.
 

 D.
 
 The Bankruptcy Court and District Court Litigation
 

 Appellants sued Cambridge for infringement of the ’391, ’496, and ’861 patents in the United States Bankruptcy Court for the District of Massachusetts on March 8, 1995.
 
 [2]
 
 Appellants filed their complaint in the bankruptcy court rather than the district court based on 11 U.S.C. § 362, the automatic stay provision of the Bankruptcy Code, and Local Rule 201 of the District Court of Massachusetts.
 
 [3]
 
 Appellants alleged that Cambridge infringed the ’861 patent by making, using, and/or selling HIV diagnostic kits that contained at least one of the proteins claimed in the patent.
 
 See
 
 Compl. at 3. Appellants further alleged that Cambridge infringed the ’391 and ’496 patents by making, using, and/or selling diagnostic kits for detecting antibodies to HIV-2.
 
 See id.
 
 at 3-4. Based on these allegations, appellants sought damages and a permanent injunction.
 
 See id.
 
 at 4. Appellants further asserted that the proceeding was not a “core proceeding” as set forth in 28 U.S.C. § 157(b)(2) and that
 
 *1364
 
 they did not consent to. the entry of any final order or judgment by the bankruptcy court.
 
 See
 
 Compl. at 1-2;
 
 See also
 
 28 U.S.C. § 157(b)(1), (c)(1)-(c)(2).
 
 [4]
 
 Lastly, appellants demanded a jury trial for all of the issues raised in their complaint.
 
 See
 
 Compl. at 5. •
 

 In its Answer and Counterclaim, Cambridge denied that the proceeding was á non-core proceeding as well- as appellants’ allegations -of infringement.
 
 See
 
 Answer and Countercl. at 1-3. Cambridge raised several affirmative defenses, including, inter alia, (1) that it possessed a license to make, use, and sell the inventions claimed in the .’391 and ’496 patents, (2) that appellants were estopped from or had waived their right to assert infringement claims regarding these patents, and (3) that the ’861 patent was invalid and not infringed.
 
 See id.
 
 at ,3-4.., In the Answer and Counterclaim, Cambridge sought a declaration that Institut Pasteur, by way of its subsidiaries and' affiliates, had provided Cambridge with a valid license to the ’391 and ’496 patents under the 1989 Agreement between Cambridge and PSD.
 
 See id.
 
 at 7. Alternatively, Cambridge requested the bankruptcy court to find that Institut Pasteur had breached the “best efforts” provision of the 1989 Agreement by failing, through PSD, to acquire the rights to these patents from Genetic and therefore that appellants were -estopped from .asserting an infringement claim against Cambridge.
 
 See id.
 
 at 8-9. Cambridge also sought a declaration that, inter alia, the ’861 patent is invalid and not infringed.
 
 See id-
 

 1.
 
 Core Proceeding and Right to a Jury Trial
 

 Cambridge sought an order from the bankruptcy court declaring the adversary proceeding a “core proceeding” as defined • by 28. U.S.C. § 157(b)(2). At a May 26,' 1995 hearing, the bankruptcy court, from the bench, granted Cambridge’s motion, concluding that the proceeding qualified as a “core proceeding” under § 157(b)(2)(B) or § 157(b)(2)(0).
 
 [5]
 
 The court concluded that the proceeding fell within
 
 *1365
 
 § 157(b)(2)(B) because, in essence, appellants were prosecuting a claim in bankruptcy against Cambridge’s estate when they filed their infringement complaint, which was in reality a proof of claim.
 
 See
 
 Findings and Rulings at 41-43,
 
 Pasteur I
 
 (No. 94-43054). Alternatively, the court ruled that the proceeding was core because the dispute went to a central aspect of the reorganization, and thus would fall within the catchall provision of § 157(b)(2)(0).
 
 See id.
 
 at 43-44. Finally, the bankruptcy court denied appellants’ request for a jury trial based on the core and equitable nature of the proceeding.
 
 See
 
 Findings and Rulings at 44,
 
 Pasteur I
 
 (No. 94-43054);
 
 Pasteur I,
 
 186 B.R. at 12.
 
 [6]
 

 2.
 
 Rule 19 Joinder
 

 Under Rule 19 of the Federal Rules of Civil Procedure,
 
 [7]
 
 appellants moved to dismiss the portions of Cambridge’s counterclaim in which it requested a declaratory judgment that it possessed a license to the ’391 and ’496 patents, or that alternatively, Institut Pasteur, via PSD, had breached its best efforts obligation to acquire the right to grant a license and that appellants were thus estopped from asserting infringement. Appellants argued that the bankruptcy court could not adjudicate these counts of the counterclaim because PSD, the other party to the 1989 Agreement, was a necessary and indispensable party to the adjudication.
 
 See Pasteur I,
 
 186 B.R. at 17. The bankruptcy court disagreed and held that PSD was not a necessary party under Rule 19(a).
 
 See id.
 
 at 19. The bankruptcy court observed that by 'its ruling that Cambridge was licensed under the ’391 and ’496 patents, PSD’s rights were not affected, as it did not possess rights to the patents before or after the ruling.
 
 See id.
 
 at 18.
 

 
 *1366
 
 Despite the bankruptcy court’s conclusion that PSD was not a necessary party, the court proceeded to balance the equities under Rule 19(b) and concluded that PSD was also not an indispensable party.
 
 See
 
 id.at 19. The bankruptcy court observed that there would be no prejudice to PSD because, as noted before, none of its rights had been altered, as it did not then possess rights to the patents. As to the other factors under Rule 19(b), the bankruptcy court reasoned that: (1) due to the absence of prejudice, there would be no need to “shape” the judgment to reduce the prejudice to the parties, (2) a judgment declaring the rights owned by Cambridge would give Cambridge adequate relief, and (3) Cambridge would not have an adequate remedy if the portions of its Answer and Counterclaim at issue were dismissed, as it would have to sue in France (where it could not sue Genetic), thus greatly hindering an efficient reorganization.
 
 See id.
 
 The bankruptcy court also noted several other equitable considerations in favor of Cambridge, including that PSD could easily have become a party to the lawsuit, thus eliminating any argument regarding prejudice, that both Genetic and Institut Pasteur, as related companies, adequately represented PSD, and that appellants were responsible for the nonjoinder, not Cambridge.
 
 See id.
 

 On appeal, the district court affirmed. As to the 19(a) issue, the district court disagreed with the bankruptcy court and held that since PSD was a signatory to the 1989 Agreement, it was a necessary party.
 
 See Pasteur III,
 
 212 B.R. at 18.' However, the district court agreed with the bankruptcy court that it was proper to have proceeded without PSD under Rule 19(b) “based upon principles of ‘equity and good conscience.’ ”
 
 See id.
 
 (quoting Fed. R.Civ.P. 19(b)).
 

 3.
 
 Declaration that the ’391 and %96 Patents Were “Licensed Patents”
 

 Cambridge moved for summary judgment of noninfringement as to both the ’391 and ’496 patents. In support of its argument that it was licensed to practice the ’391 and ’496,patents pursuant to its 1989 Agreement with PSD, Cambridge principally asserted that since PSD was the sole owner of SDP, and because SDP then acquired all of the stock of Genetic, this acquisition constituted a “recovery” by PSD of the ’391 and ’496 patent sublicens-ing rights from Genetic under the 1989 Agreement.
 
 See Pasteur I,
 
 186 B.R. at 16. The Bankruptcy Court rejected this argument, reasoning that (1) possessing the right to grant sublicenses and owning a corporation whose wholly-owned subsidiary possesses that right are not the same and (2) the acquisition of Genetic was not contemplated by the parties when the 1989 Agreement was signed.
 
 See id.'
 

 Turning to .Cambridge’s “best efforts” argument, however, the bankruptcy court, acting in equity, applied the equitable maxim “equity treats as done that which in good conscience should be done.”
 
 See id.
 
 The court noted that although PSD had obligated itself to use best efforts to obtain the ’391 and ’496 patent rights, it had breached that obligation by failing to make
 
 any
 
 effort to recover the rights following the execution of the 1989 Agreement, despite wholly owning the company (SDP) that wholly owned Genetic. See
 
 id.
 
 The bankruptcy court essentially concluded that it would be inequitable for PSD not to be regarded as having recovered the rights.'
 
 See id.'
 
 The bankruptcy court thus declared the ’391 and ’496 patents “Licensed Patents” under the 1989 Agreement and dismissed appellants’ infringement claims under these patents.
 
 See id.
 
 at 22.
 

 Reviewing the bankruptcy court’s grant of summary judgment of noninfringement de novo, the district court affirmed, concluding that there was no genuine issue of. material fact.
 
 See Pasteur III,
 
 212 B.R. at 17. The court observed that while there was a dispute as to the meaning and intent of the “best efforts” clause, it was clear that the clause required at least
 
 some
 
 effort, and it was undisputed that PSD made no effort to recover the
 
 *1367
 
 sublicensing rights from Genetic.
 
 See id.
 
 Accordingly, since the clause was unambiguous to that extent, the district court concluded that by making no effort, PSD had in fact breached the 1989 Agreement. See
 
 id.
 
 The district court further concluded that the bankruptcy court’s application of equitable principles in declaring that Cambridge was licensed to practice the ’391 and ’496 patents was appropriate under the circumstances.
 
 See id.
 

 4.
 
 Award of a 1% Royalty Rate for Past Infringement and Future Practice of the ’861 Patent
 

 Both Cambridge and appellants moved for summary judgment on the issue of infringement of the ’861 patent. The bankruptcy court held that claims 1-4 were not invalid- and were infringed by sales of Cambridge’s HIV-1 diagnostic kit.
 
 See Pasteur I,
 
 186 B.R. at 19-22. The bankruptcy court enjoined Cambridge from making, using, or selling its HIV-1 Western Blot kits for the remainder of the life of the patent, see
 
 Pasteur I,
 
 186 B.R. at 22, although the bankruptcy court stayed the injunction pending its determination of Cambridge’s rights under the 1987 Settlement Agreement,
 
 see Pasteur II,
 
 slip op. at 2. The bankruptcy court held a trial to determine the royalty rate which Cambridge was obligated to pay for future practice of the ’861 patent under the 1987 Agreement, as well as the damages to which appellants were entitled for Cambridge’s past infringement. Significantly, the parties did not dispute that Cambridge was entitled to a license of the ’861 patent under the 1987 Agreement.
 
 See id.
 
 at 7.
 

 The bankruptcy court first determined the appropriate royalty rate that Cambridge was obligated to pay Instituí Pasteur for future practice of the ’861 patent. The bankruptcy court noted that, contrary to Cambridge’s assertion, ¶ 3 of § 2 of the 1987 Agreement did not squarely apply to this case, because that provision covers a scenario in which a licensor decides to license improvement technology to an existing licensee, and as part of that license, the licensor reduces the royalty payments that the licensee already pays for “existing technology.”
 
 See id.
 
 at 8. In contrast, in this case, Genetic (the licensee) pays Insti-tuí Pasteur (the licensor), via PSD, one royalty rate (6%) for
 
 all
 
 of Instituí Pasteur’s technology, both' existing and improvement.
 
 See id.
 
 at 8-9. The bankruptcy court further observed that the 1987 Agreement contains no provision expressly covering the facts of the present case.
 

 The bankruptcy court nevertheless concluded that the best indication of how to determine the portion of the 6% attributable to improvement technology alone, such as the ’861 patent, was to follow the procedure set forth in ¶ 3. The bankruptcy court therefore subtracted the “existing royalty rate” of ¶ 6(5%), from the “aggregate royalty” percentage (6%) to arrive at a 1% royalty rate for the improvement technology.
 
 See id.
 
 at 9-10. The bankruptcy court noted that while one might argue that the ’861 patent is only part of the improvement technology, and thus that the royalty rate should be less than 1%, no evidence suggested otherwise how to allocate the charges for the various improvement technologies.
 
 See id.
 
 at 10. Accordingly, the bankruptcy court concluded that Instituí Pasteur charged Genetic a 1% royalty for the ’861 patent,
 
 see id.
 
 at 10, and that Cambridge was entitled under the 1987 Agreement to pay the same amount.
 

 The bankruptcy court then calculated the damages owed by Cambridge for its past infringement. The bankruptcy court concluded that since appellants had failed to establish lost profits, appellants should be entitled under 35 U.S.C. § 284 to a “reasonable royalty,” which the bankruptcy court had previously calculated as 1% of net sales.
 
 See Pasteur II,
 
 slip op. at 15-16. Applying this 1% rate, the bankruptcy court awarded appellants $29,601.17.
 
 See Pasteur II,
 
 slip op. at 16;
 
 see also Institut Pasteur v. Cambridge Biotech Corp. (In re Cambridge Biotech Corp.),
 
 No. 94-43054-JFQ, at 1 (Bankr.D.Mass. Jan. 5, 1996) (judgment). The bankruptcy court termi
 
 *1368
 
 nated the injunction and declared a nonexclusive license of the ’861 patent (with a royalty rate of
 
 1%
 
 of Cambridge’s net sales of its Western Blot kits), to be in effect between Instituí Pasteur and Cambridge commencing January 1, 1996.
 
 See Pasteur II,
 
 slip op. at 16, 18-19;
 
 see also Institut Pasteur v. Cambridge Biotech Corp, (In re Cambridge Biotech Corp.),
 
 No. 94-43054-JFQ, at 1-2 (Bankr.D.Mass. Jan. 5, 1996) (judgment);
 
 Institut Pasteur v. Cambridge Biotech Corp. (In re Cambridge Biotech Corp.),
 
 No. 94-43054-JFQ, at 1-2 (Bankr.D.Mass. Feb. 12, 1996) (amended judgment).
 

 The district court affirmed the bankruptcy court’s grant of summary judgment of infringement and validity of the ’861 patent.
 
 See Pasteur III,
 
 212 B.R. at 15. Reviewing the bankruptcy court’s damages determination under the clearly erroneous standard, the district court affirmed, concluding that it had “no compelling reason to interpret the agreement other than as did the Bankruptcy Court.”
 
 See id.
 
 at 20. Likewise, the district court concluded .that the bankruptcy court did not clearly err in its declaration of a license between Instituí Pasteur and Cambridge.
 
 See id.
 
 at 21.
 

 DISCUSSION
 

 A.
 
 Standards of Review
 

 Whether the district court had jurisdiction at least in part under 28 U.S.C. § 1338, and thus whether we have jurisdiction under 28 U.S.C. § 1295(a), are issues of law,
 
 see Cedars-Sinai Med. Ctr. v. Watkins,
 
 11 F.3d 1573, 1577, 29 U.S.P.Q.2d 1188, 1191 (Fed.Cir.1993), that we review
 
 de novo, see James M. Ellett Constr Co., Inc. v. United States,
 
 93 F.3d 1537, 1541 (Fed.Cir.1996) (“Jurisdiction is a question of law which we review
 
 de novo.”).
 

 We review a district court’s review of a bankruptcy court decision involving patent issues independently, applying the clearly erroneous standard to the factual determinations of the bankruptcy court and de novo review to its conclusions of law.
 
 See e.g., Peterson v. Scott fin re Scott),
 
 172 F.3d 959, 966 (7th Cir.1999);
 
 Gamble v. Brown (In re Gamble),
 
 168 F.3d 442, 444 (11th- Cir.1999);
 
 Charrier v. Security Nat’l of Or. (In re Charrier),
 
 167 F.3d 229, 232 (5th Cir.1999);
 
 Grella v. Salem Five Cent Sav. Bank,
 
 42 F.3d 26, 30 (1st Cir.1994). We thus give the determinations of the district court no special deference.
 
 See Gamble,
 
 168 F.3d at 444;
 
 Charrier,
 
 167 F.3d at 232;
 
 Grella,
 
 42 F.3d at 30. We review a bankruptcy court’s grant of summary judgment, a conclusion of law,
 
 de novo. See, e.g., Miller v. J.D. Abrams, Inc. (In re Miller),
 
 156 F.3d 598, 601 (5th Cir.1998);
 
 Cumberland. Farms, Inc. v. Florida Dep’t of Envtl. Protection,
 
 116 F.3d 16,18 (1st Cir.1997). Summary judgment is properly granted when “there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law.” Fed. R.Giv.P. 56(c). “In determining whether there is a genuine issue of material fact, the evidence must be viewed in the light most favorable to the party opposing the motion, with doubts resolved in favor of the opponent.”
 
 Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.,
 
 145 F.3d 1303, 1307, 46 U.S.P.Q.2d 1752, 1755 (Fed.Cir.1998).
 

 In reviewing district court judgments in cases brought pursuant to 28 U.S.C. § 1338, we apply our own law with respect to issues of substantive patent law and certain procedural issues pertaining to patent law, but as to nonpatent issues, we apply the law of the circuit in which the district court sits.
 
 See Biodex Corp. v. Loredan Biomed., Inc.,
 
 946 F.2d 850, 855-56, 20 U.S.P.Q.2d 1252, 1256-57 (Fed.Cir. 1991);
 
 see also Engel Indus., Inc. v. Lockformer Co.,
 
 166 F.3d 1379, 1384, 49 U.S.P.Q.2d 1618, 1622 (Fed.Cir.1999). Although the First Circuit has not ruled on the issue, We are confident that it would hold that a bankruptcy court’s determination that a proceeding is a “core proceeding” is an issue of law that we must therefore review
 
 de novo. See Insurance Co. of N. Am., v. NGC Settlement Trust & Asbestos Claims Management Corp. (In re Na
 
 
 *1369
 

 tional Gypsum Co.),
 
 118 F.3d 1056, 1062 (5th Cir.1997). The First- Circuit has held that rulings under Rule 19(b) are reviewed for an abuse of discretion.
 
 See Traveler’s Indem. Co. v. Dingwell,
 
 884 F.2d 629, 635 n. 10 (1st Cir.1989).
 

 We review the construction of a license agreement de novo and interpret the licensing agreement under state law.
 
 See Studiengesellschaft Kohle, M.B.H v. Hercules, Inc.,
 
 105 F.3d 629, 632, 41 U.S.P.Q.2d 1518, 1521 (Fed.Cir.1997) (citing
 
 Cyrix Corp. v. Intel Corp.,
 
 77 F.3d 1381, 1384, 37 U.S.P.Q.2d 1884, 1887 (Fed. Cir.1996)). When we review a damages determination, the clearly erroneous standard applies to the review of the amount of damages, while the abuse of discretion standard applies to the review of the methodology chosen to compute damages.
 
 See Unisplay, S.A. v. American Elec. Sign Co.,
 
 69 F.3d 512, 517 n. 8, 36 U.S.P.Q.2d 1540, 1544 n.8 (Fed.Cir.1995);
 
 see also
 
 Smith-
 
 Kline Diagnostics, Inc. v. Helena Lab. Corp.,
 
 926 F.2d 1161, 1164-65 & n. 2, 17 U.S.P.Q.2d 1922, 1924-25 & n.2 (Fed.Cir. 1991).
 

 We review the grant of an equitable remedy for abuse of discretion.
 
 See Power Lift, Inc. v. Weatherford Nipple-Up Sys., Inc.,
 
 871 F.2d 1082, 1084, 10 U.S.P.Q.2d 1464, 1466 (Fed.Cir.1989) (stating that reinstatement of license was an exercise of equitable powers, reviewable for abuse of discretion). “We review the trial court’s exercise of discretion to determine whether (1) the decision was clearly unreasonable, arbitrary, or fanciful; (2) the decision was based on an erroneous conclusion of law; (3) the court’s findings were clearly erroneous; or (4) the record contains no evidence upon which the court rationally could have based its decision.”
 
 Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.,
 
 944 F.2d 870, 876, 20 U.S.P.Q.2d 1045, 1050 (Fed.Cir.1991).
 

 B.
 
 Appellate Jurisdiction
 
 .
 

 Before proceeding to the merits we must first address the issue as to whether we possess jurisdiction to hear appellants’ appeal.
 
 See Bender v. Williamsport Area School Dist.,
 
 475 U.S. 534, 541, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986) (“[E]very federal appellate court has a special obligation to ‘satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review,’ even though the parties are prepared to concede it.”) (quoting.
 
 Mitchell v. Maurer,
 
 293 U.S. 237, 244, 55 S.Ct. 162, 79 L.Ed. '338 (1934)).- Cambridge previously moved' this court to dismiss appellants’ appeal for lack of jurisdiction, a motion we denied in an unpublished order.
 
 See Institut Pasteur v. 'Cambridge Biotech Corp. (In re Cambridge Biotech Corp.),
 
 Nos. 98-1012, -1013, -1041 (Fed. Cir. Feb. 20, 1998),
 
 motion for reconsideration denied,
 
 (Fed. Cir. Apr. 29,1998).
 

 Upon reconsideration, we again conclude that we possess jurisdiction to hear appellants’ appeal. ' Our jurisdiction, as defined by § 1338(a), extends to “those cases in which a well-pleaded complaint establishes either that federal patent law creates the cause of action or that the plaintiffs right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims.”
 
 Christianson v. Colt Indus. Operating Corp.,
 
 486 U.S. 800, 809, 108 S.Ct. 2166, 100 L.Ed.2d 811, 7 U.S.P.Q.2d 1109, 1113 (1988);
 
 see Cedars-Sinai,
 
 11 F.3d at 1577, 29 U.S.P.Q.2d at 1191 (“The critical inquiry is whether in fact the complaint asserted a claim arising under the patent laws.”) (quotation omitted);
 
 see also
 
 28 U.S.C. § 1338 (“The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents_”); 28 U.S.C. § 1295(a)(1) (“The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction — (1) of an appeal from a final decision of a district court of the United States ... if the jurisdiction of that court was based, in whole or in part, on section 1338 of this title.... ”). Appellants’ complaint, while referred to the bankruptcy court, clearly invoked § 1338 by its multiple allegations of infringement.
 
 See
 
 
 *1370
 
 Compl. at 3-4. Moreover, we note that both the bankruptcy court and the district court decided substantial questions of federal patent law, including patent infringement and validity. Thus, while the .district court reviewed the bankruptcy court’s decisions under 28 U.S.C. § 158,
 
 [8]
 
 this does not affect the fact that the district court’s jurisdiction was based at least in part on 28 U.S.C. § 1338. Accordingly, we conclude that we have jurisdiction over appellants’ appeal under 28 U.S.C. § 1295(a)(1) (1994).
 

 C. Core
 
 Proceeding and Appellants’ Right to a Jury Trial
 

 Appellants argue that the lower courts erred in denying them a jury trial. This argument is intertwined with the question whether the proceeding in the bankruptcy court constituted a “core proceeding.” As discussed above,
 
 see supra
 
 note 4, whether the bankruptcy court correctly held that the proceeding before it was a “core proceeding” is pivotal with respect,to whether the district court accorded proper deference to the bankruptcy court and thus whether we must remand the case for a different depth of review. Both issues turn on whether appellants’ infringement allegations constituted “claims” in the bankruptcy court; we will address both issues concurrently.
 

 Appellants first argue that their demand for a jury trial in their complaint containing patent infringement claims established their right to a jury trial. They argue that the bankruptcy court erred in holding that the proceeding was core and that appellants were therefore not entitled to a jury trial. Appellants assert that the infringement allegations in the complaint were not “claims” in the bankruptcy sense, and thus the complaint did not invoke 28 U.S.C. § 157(b)(2)(B). Appellants continue that the case was brought to the bankruptcy court as a “non-core” proceeding'because (1) the infringement claims were not based on the creation, recognition, or adjudication of bankruptcy rights, (2). these claims would have survived outside of bankruptcy, and (3) the resolution of the dispute had nothing to do with-bankruptcy law. Cambridge responds- that appellants had no right to a jury trial because the bankruptcy court correctly determined that this proceeding was a “core proceeding” under § 157(b)(2)(B), as appellants’ allegations were “claims.” Cambridge alternatively asserts that appellants waived their jury trial arguments by not properly raising them on appeal to the district court.
 

 Both the core proceeding and jury trial issues hinge on whether the allegations in appellants’ complaint were “claims” in the bankruptcy sense and thus whether appellants, in filing their complaint, effectively filed a proof of claim in the bankruptcy court.'
 
 See
 
 4
 
 Collier on Bankruptcy
 
 ¶ 502.02[l][c], at 502-11 (Lawrence P. King, ed., 15th ed.1998) (hereinafter
 
 “Collier
 
 ”) (“Explicit in the concept of filiiig a proof of claim is the idea that the proof of claim must set forth a ‘claim.’ ”). The term “claim” is broadly defined by the’ bankruptcy code as a
 

 (A)
 
 right to payment,
 
 whether or not such right is reduced to judgment, liquidated, unliqpidated," fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, unsecured ....
 

 11 U.S.C. § 101(5)(A) (emphasis added).
 
 Collier on Bankruptcy
 
 observes that the legislative history supports a broad definition of “claim.”
 
 See
 
 2
 
 Collier
 
 ¶ 101.05[1], at 101-26 (“By fashioning a single definition of claim in the Bankruptcy Code, Con
 
 *1371
 
 gress intended to adopt the broadest available definition of the term”).
 
 Collier
 
 also addresses the place of tort claims under the Code’s definition of “claim”:
 

 As distinguished from prior bankruptcy law, tort claims constitute claims, and thus are payable out of the estate, and constitute dischargeable debts.... Under the Code the fact that the tort claim may be unliquidated or disputed does not mean that it is not a claim.
 

 Id.
 
 at ¶ 101.05[6], 101-36.3. Patent infringement is properly classified as a tort, albeit one created by federal statute.
 
 See, e.g., SD Sys., Inc. v. Aarotech Lab., Inc.,
 
 160 F.3d 1373, 1378, 48 U.S.P.Q.2d 1773, 1777 (Fed.Cir.1998).
 

 We agree with the bankruptcy court’s conclusion that, the allegations in appellants’ complaint constituted bankruptcy “claims.” Appellants’ complaint sought money damages,
 
 i.e.,
 
 a “right to payment,” as compensation for the tort of infringement allegedly committed by Cambridge. Under the broad definition of “claim” provided for in § 101(5), and in view of Congress’s intent that the term “claim” should be construed liberally, we are persuaded that appellants’ allegations were clearly “claims.” We thus conclude that appellants’ complaint constituted a proof of claim.
 

 We disagree with appellants that the proceeding is a “non-core proceeding” merely because it .dealt with patent infringement and other issues which do not arise directly from the bankruptcy laws. By filing what amounted to a proof of claim, appellants initiated the “allowance or disallowance of claims against the estate ...,” a core bankruptcy proceeding.
 
 See
 
 28 U.S.C. § 157(b)(2)(B). The Supreme Court and our sister circuits have repeatedly held that the filing of a proof of claim is determinative in classifying the proceeding as a core proceeding.
 
 See Langenkamp v. Culp,
 
 498 U.S. 42, 44, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990) (“In
 
 Granfinanciera
 
 we recognized that by filing a claim against a bankruptcy estate the creditor triggers the process of ‘allowance
 

 and disallowance of claims,’ thereby subjecting himself to the court’s equitable power.”) (quoting
 
 Granfinanciera, S.A. v. Nordberg,
 
 492 U.S. 33, 58-59 & n. 14, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989));
 
 see also Benedor Corp. v. Conejo Enters., Inc. (In re Conejo Enters., Inc.),
 
 96 F.3d 346, 352 (9th Cir.1996);
 
 United States Abatement Corp. v. Mobil Exploration & Producing U.S., Inc. (In re United States Abatement Corp.),
 
 79 F.3d 393, 398 n. 9 (5th Cir.1996);
 
 S.G. Phillips Constructors, Inc. v. City of Burlington, Vt. (In re S.G. Phillips Constructors, Inc.),
 
 45 F.3d 702, 705 (2d Cir.1995);
 
 In re Meyertech Corp. v. Southeastern Sprinkler Co., Inc. (In re Meyertech Corp.),
 
 831 F.2d 410, 417 (3d Cir.1987). The fact that the bankruptcy court must apply the patent laws to assess the merits of patent infringement and validity does not alter our conclusion; in the process of allowing or disallowing claims under § 157(b)(2)(B), a bankruptcy court always applies relevant federal or state law. As noted by
 
 Collier:
 

 After
 
 objection is made to a proof
 
 of
 
 claim, one of the tasks of the court is to determine the “amount” of the claim. In determining the amount of a claim, the court must be guided by otherwise -applicable state or federal law. In so determining the amount, the court is concerned with the proper existence of the claim under state or federal law, whether the claim is liquidated or contingent and any other issues which bear upon the amount of the claim.
 

 4
 
 Collier
 
 ¶ 502.03[l][a], at.502-21;
 
 see also id.
 
 at ¶ 502.03[2][b], at 502-27 (“The validity and legality of claims generally is determined by applicable nonbankruptcy law.”).
 

 We therefore hold that the bankruptcy court properly concluded that this proceeding, based on claims for patent infringement, was a “core proceeding.” As noted previously, when the proceeding is a “core” proceeding, the bankruptcy court may enter judgments and orders,
 
 see
 
 28 U.S.C. § 157(b)(1), in contrast to non-core related proceedings, in which the bank
 
 *1372
 
 ruptcy court may enter only proposed findings of fact and conclusions of law,
 
 see id.
 
 at §. 157(c)(1), unless the parties consent,
 
 see id.
 
 at § 157(c)(2).
 
 See supra
 
 note 4. As a consequence, we further hold that the bankruptcy court properly rendered final judgments and orders, and that the district court correctly reviewed the bankruptcy court’s findings of fact for clear error and its conclusions of law de novo while acting in its appellate capacity under 28 U.S.C. § 158.
 

 We also disagree with appellants that the lower courts improperly denied their request for a jury trial. The precedent is clear that once a party invokes the core jurisdiction of the bankruptcy court by filing a proof of claim, that party has no Seventh Amendment right to a jury trial.
 
 See Langenkamp v. Culp,
 
 498 U.S. at 44-45, 111 S.Ct. 830;
 
 Granfinanciera,
 
 492 U.S. at 58-59, 109 S.Ct. 2782;
 
 see also Germain v. Connecticut Nat’l Bank,
 
 988 F.2d 1323, 1329 (2d Cir.1993) (holding that “the
 
 Katchen [v. Landy,
 
 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391
 
 (1966)], Granfinanciera,
 
 and
 
 Langenkamp
 
 line of Supreme Court cases stand for the proposition that by filing a proof of claim a creditor forsakes its right to adjudicate before a jury any issue that bears directly on the allowance of that claim.... ”). Because we conclude that appellants were not entitled to a jury trial
 
 ab initio,
 
 we need not address Cambridge’s arguments regarding waiver.
 

 D.
 
 Rule 19 Joinder'Analysis
 

 Appellants argue that under Rule 19, the bankruptcy court erred in failing to dismiss the portion of Cambridge’s Answer and Counterclaim in which it requested a declaratory judgment that it possessed a license under the 1989 Agreement to the ’391 and ’496 patents, or alternatively, that Institut Pasteur, via PSD, had breached its best efforts obligation under the agreement and that appellants were thus estopped from asserting infringement against Cambridge. While agreeing with the district court’s conclusion that PSD is a necessary party under Rule 19(a), appellants argue that under the four-factor “equity and good conscience” ■ test of Rule 19(b), the equities weigh in favor of not proceeding with the portion of Cambridge’s counterclaim at issue without PSD. Cambridge, on the other hand, contends that the equitable factors cited by the lower courts weigh in favor of proceeding without PSD.
 

 Whether a party is “indispensable” to an adjudication is determined by performing a two-step analysis under Rule 19 of the Federal Rules of Civil Procedure.
 
 See Pujol v. Shearson/Am. Express, Inc.,
 
 877 F.2d 132, 135 (1st Cir.1989). The first step requires the court to inquire under Rule 19(a) whether the party
 
 should
 
 be joined if feasible,
 
 i.e.,
 
 is the party “necessary.”
 
 See id.
 
 . If the party is necessary, as the district court decided here,, but it is not feasible to join that party, the court proceeds to step two, set forth in Rule 19(b).
 

 In step two, the court weighs four factors or “interests” listed in Rule 19(b) “to determine whether, in equity and good conscience, the court should proceed without a party whose absence is compelled.”
 
 Provident Tradesmens Bank & Trust Co. v.
 
 Patterson,. 390 U.S. 102, 109, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968) (footnote omitted);
 
 see also Pujol,
 
 877 F.2d at 134. Application of this test determines whether or not a party is “indispensable.”
 
 See Pujol,
 
 877 F.2d at 134. Significantly, “[t]hese factors ... are not mutually exclusive, nor are they the only considerations that may be taken into account by the court in a particular case.”
 
 See
 
 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane,
 
 Federal Practice and Procedure
 
 § 1607, at 88 (2d ed.1986). Indeed, the “equity and good conscience” test is flexible; thus, whether a particular party will be deemed “indispensable”- will depend heavily on the circumstances of each case.
 
 See id.
 
 at 90. The First Circuit has observed that in applying Rule 19, a court must take into account that the purpose of the Rule is to obtain a practical objective,
 
 *1373
 
 which--is to -“involve as many apparently concerned persons as is compatible with efficiency and due process.”
 
 See Pujol,
 
 877 F.2d at < 134 (quotation and internal quotation marks omitted).
 

 Appellants’ arguments do not persuade us that the bankruptcy court abused its discretion in concluding that PSD was not an indispensable party under Rule 19(b). As for the first interest, prejudice to PSD or other parties to the action, contrary to appellants’ contentions, the bankruptcy court reasonably detected no prejudice to PSD. First, PSD did not possess sublicens-ing rights to the ’391 or ’496 patents before or after the bankruptcy court’s ruling; second, its interests are adequately represented by Instituí Pasteur, which holds a minority interest in PSD, and by Genetic, which does possess the sublicensing rights and is wholly owned by SDP, which is in turn wholly owned by PSD.
 
 See Pasteur I,
 
 186 B.R. at 18-19;
 
 cf. Dainippon Screen Mfg. Co., Ltd. v. CFMT, Inc.,
 
 142 F.3d 1266, 1272, 46 U.S.P.Q.2d 1616, 1620 (Fed. Cir.1998) (holding that when a parent corporation is a party to the litigation, an argument that a wholly owned subsidiary is not adequately represented is “wholly unconvincing”). Moreover, both parties’ interests are closely aligned to those of PSD: Instituí Pasteur is the assignée and licensor of the ’391 and ’496 patents, and Genetic possesses sublicenses to these patents. Because we conclude that there is effectively no prejudice to PSD ’ or other parties due to PSD’s absence, the second interest, the ability of the court to shape the judgment to lessen ■ prejudice,' also weighs in favor of proceeding without PSD. Here, the court needed to do nothing to reduce the prejudice to PSD or other parties because there was none.
 

 Turning to the third interest, we must determine whether the relief granted “will be an adequate remedy for the alleged wrong to plaintiff or whether it will leave him only partially compensated, which may lead to further litigation.”
 
 See
 
 7 Charles Alan Wright, Arthur R; Miller
 
 &
 
 Mary Kay Kane, § 1608, at 116. -The Supreme Court characterizes this interest as “the interest of the courts and the public in complete, consistent and efficient settlement of controversies.”
 
 See Provident Tradesmens,
 
 390 U.S. at 111, 88 S.Ct. 733. The bankruptcy court correctly observed that the 1989 Agreement requires suits against PSD to be brought in France; accordingly, there is a strong likelihood that Cambridge could not simultaneously obtain jurisdiction over PSD and Genetic, as Genetic does business exclusively in this country.
 
 See Pasteur I,
 
 186 B.R. at 19. Such piecemeal litigation would take considerable time and would greatly hinder Cambridge’s reorganization.
 
 See id:
 
 Such an alternative would not only provide an inadequate remedy for Cambridge, but protracted and ongoing litigation would also not be in the interest of either the public or the courts. Accordingly, the bankruptcy court was reasonable in concluding that this factor weighs strongly in favor of Cambridge.
 

 As for the fourth interest, whether Cambridge will have .an adequate remedy if its defenses are dismissed, the bankruptcy court again reasonably concluded that this factor favors Cambridge. Cambridge would be left without an adequate remedy if its only defenses to appellants’ allegations of infringement were dismissed for nonjoinder.
 
 See id.; Pasteur III,
 
 212 B.R. at 18.
 

 Finally, we note that the bankruptcy court reasonably concluded that additional equitable considerations also weigh heavily in favor of Cambridge. PSD could easily have become a party to this lawsuit, and in fact, it appeared in the main bankruptcy case, represented by the same attorney representing appellants.
 
 See Pasteur I,
 
 186 B.R. at 19. Cambridge is not responsible for the nonjoinder. Ironically, Insti-tuí Pasteur and Genetic protest the absence of PSD, yet it is difficult to believe that these two entities, which presumably exercise some influence over PSD in relation to the patents, could not prevail upon PSD to join the suit to resolve all the issues. It is incongruous for Genetic in
 
 *1374
 
 particular to argue that it suffers prejudice from the lower court’s ruling when it possesses the sublicensing rights and it is its grandparent company that has refused to join the suit. Accordingly, we conclude that the bankruptcy court did not abuse its discretion in concluding that the litigation should proceed in the absence of PSD under Rule 19(b).
 

 E.
 
 The’391 and %96 Patents
 

 1.
 
 Construction of the 1989 Agreement and Its Breach
 

 Appellants advance several arguments that the bankruptcy court erred in granting Cambridge’s motion for summary judgment of noninfringement and that it abused its discretion iii’ declaring Cambridge a sublicensee under the ’891 and ’496 patents. Appellants first argue that there are genuine issues of material fact regarding both the intent of the parties as to the recovery of rights clause (¶ 2.2) in the 1989 Agreement and the alleged breach of this provision. Appellants assert that fact-finding and consideration of parol evidence are necessary to resolve contractual ambiguity. Appellants further contend that the parties did not intend “best efforts” to require PSD to pursue the recovery of the HIV-2 license rights after Elf Sanofi, Inc. acquired Genetic, because ¶ 2.2 was limited to PSD’s ongoing renegotiation of the 1984 BVD agreement with Genetic,
 
 ie.,
 
 there was no continuing obligation, as indicated by the term “results” in ¶ 2.2.
 
 See
 
 Jbint App.' at 1274 (“DP represents that it is currently discussing such recovery with GENETIC SYSTEMS and will inform CBS [Cam-' bridge] with the progress and results of such discussions”). Secondly, appellants argue that the court abused its discretion in declaring that the ’391 and ’496 patents were “licensed patents” under the 1989 Agreement. Appellants assert that the bankruptcy court abused its discretion in applying the maxim “equity treats as done that which in good conscience should be done” because, more accurately, “equity regards that as done which was
 
 agreed
 
 or
 
 directed
 
 to be done,” thereby carrying out the intent of the parties.' Here, appellants continue, PSD and Genetic did not agree, intend, or direct that PSD’s best efforts obligation would continue after negotiations with Genetic failed. Moreover, appellants contend that the equities balance in favor of PSD in any case.
 

 Cambridge responds .that the 1989 Agreement raises no genuine issues of material fact because ¶ 2.2 is unambiguous, and under Massachusetts law it must be enforced according to its terms. Cambridge contends that appellants are ' attempting to use parol evidence to inject ambiguity into the contract as to the parties’ intent, despite the presence of an integration clause, ¶ 8.2.
 
 [9]
 
 Cambridge further contends that there is no dispute as to the breach of ¶ 2.2, because doing nothing clearly breaches the “best efforts” clause. Lastly, Cambridge argues that the bankruptcy court properly granted equitable relief. Cambridge asserts that the bankruptcy court did look to the intent and meaning of the agreement and concluded that PSD had violated the best efforts clause, , Cambridge additionally asserts that the bankruptcy court properly weighed the equities when it held for Cambridge.
 

 Under Massachusetts law,
 
 [10]
 
 “it is ... elementary that an unambiguous agreement must be enforced according to its terms,”
 
 see Schwanbeck v. Federal-Mogul Corp.,
 
 412 Mass. 703, 592 N.E.2d
 
 *1375
 
 1289, 1292 (1992), and “a court considers extrinsic evidence to discern intent only when a contract term is ambiguous,”
 
 see Massachusetts Mun. Wholesale Elec. Co. v. Town of Danvers,
 
 411 Mass. 39, 577 N.E.2d 283, 289 (1991). Once the court assures itself that the written contract was intended by the parties to represent their complete agreement, parol evidence may not be considered.
 
 See Carlo Bianchi & Co., Inc. v. Builders’ Equip. & Supplies Co.,
 
 347 Mass. 636, 199 N.E.2d 519, 524 (1964);
 
 see also Tilo Roofing Co. v. Pellerin, 831
 
 Mass. 743, 122 N.E.2d 460, 462 (1954) (“As the written agreement shows on its face that it was intended to set forth the entire agreement of the parties ... its terms cannot be varied or supplemented by parol evidence.”).
 

 Upon reviewing the construction of the 1989 Agreement de novo, we agree with Cambridge that ¶ 2.2 is unambiguous and therefore that extrinsic evidence of the. intent of the parties is not relevant. Paragraph 2.2 could not be
 
 clearer
 
 — the parties agreed that PSD was to exercise its best efforts to recover the rights to. the ’391 and ’496 patents. Despite appellants’ contention that the parties intended ¶2.2 to be limited to PSD’s renegotiation of the 1984 BVD agreement, that provision sets no qualifications, time limits, or restrictions on PSD’s efforts to recover the subli-censing rights to the patents, and we do not interpret the term “results” to impart any temporal limit on PSD’s best efforts obligation. That portion of ¶ 2.2 simply states that PSD will report to Cambridge on the progress of its recovery of rights negotiations with Genetic. We see no reason to resort to any extrinsic evidence to assist in the interpretation of this unambiguous provision, especially in view of the integration clause, which indicates that the parties’ intent is reflected within the four corners of the writing.
 
 See Tilo Roofing,
 
 122 N.E.2d at 462. Thus, we agree with the bankruptcy court that the “best efforts” clause means, at the very least, that PSD had to make a serious and continuing effort to recover the rights to the patents at issue.
 

 It is likewise clear that Institut Pasteur (via PSD) breached ¶ 2.2, because it is undisputed that PSD made no real effort to recover the rights at issue.
 
 See Macksey v. Egan,
 
 36 Mass.App.Ct. 463, 633 N.E.2d 408, 414 (1994) (stating that “best efforts” requires “that the party put its muscles to work to perform with'full energy and fairness the relevant express promises and reasonable implications therefrom”). We therefore conclude that the bankruptcy court properly granted summary judgment in favor of Cambridge, as there was no genuine issue of material fact as to the intent of the parties regarding ¶ 2.2 or its breach.
 

 2.
 
 The Remedy for Breach of the 1989 Agreement
 
 -
 

 Appellants next contend that the bankruptcy court abused its discretion in declaring that Cambridge was licensed under the 1989 Agreement as a remedy for the breach of the 1989 Agreement. Appellants principally assert that the bankruptcy court applied the wrong equitable standard and improperly weighed the equities in favor of' Cambridge. Appellants’ argument as to the wrong standard is easily dismissed; even if we were to accept the assertion that the bankruptcy court should have applied the equitable standard proposed by appellants,
 
 i.e.,
 
 “equity regards that as done which was agreed or directed to be done,” the result is the same. The bankruptcy court effected what the parties intended, agreed, and directed w.ould be done, which was that PSD would use its best efforts to recover the rights to the patents. As we concluded above, this intent was plainly expressed in ¶ 2.2.
 

 Appellants further contend that the equities weigh in their favor. Appellants principally argue that PSD could not have granted rights which it did not possess (Genetic and PSD are distinct legal entities), and that the bankruptcy court’s decision conflicts with the public policy against disregarding corporate entities absent illegitimate purposes. We dis
 
 *1376
 
 agree. The concept of “piercing the corporate veil” is equitable in nature and- courts will pierce the corporate veil “to achieve justice, equity, to remedy or avoid fraud or wrongdoing, or to impose a just liability.”
 
 See
 
 1 William M. Fletcher,
 
 Fletcher Cyclopedia of the Law of Private Corporations
 
 § 41.20, at 598-601, 603 (Perm. ed.1999). Under Massachusetts law,
 
 [11]
 
 “corporations are generally to be regarded as separate from each other and from their respective stockholders where there is no occasion to look beyond the corporate form-for the purpose of defeating fraud or wrong, or for the remedying of injuries. [However, t]he general principle is not of unlimited application.”
 
 My Bread Baking Co. v. Cumberland Farms, Inc.,
 
 353 Mass. 614, 233 N.E.2d 748, 751 (1968) (internal citations, quotations, and quotation marks omitted).
 

 While Massachusetts law is clear that the corporate veil should only rarely be pierced to prevent “gross inequity,”
 
 see Gurry v. Cumberland Farms, Inc.,
 
 406 Mass. 615, 550 N.E.2d 127, 133 (1990) (citation omitted), we conclude that the bankruptcy court properly disregarded the corporate structures at issue here to achieve an equitable result. Appellants cannot enable PSD to shirk its contractual obligations by permitting it to hide behind its wholly-owned subsidiary, SDP, a company which wholly owns Genetic, the holder of the sublicensing rights.
 
 See
 
 Fletcher, § 41.10, at 587 (‘Wholly owned subsidiaries present a common situation ripe for piercing the corporate veil.”). PSD could have satisfied its best efforts obligation by directing SDP to direct Genetic to transfer the right to operate under the patents, thereby satisfying its best efforts obligation. Instead, PSD did essentially nothing. In this case, “[t]o do equity among the parties, undue emphasis cannot fairly be placed upon strict compliance with corporate formalities.”
 
 Samia v. Central Oil Co. of Worcester,
 
 339 Mass. 101, 158 N.E.2d 469, 474 (1959). As to the other factors cited by appellants in their brief, we are not persuaded that the bankruptcy court was unreasonable in concluding that they do not sufficiently weigh in favor of appellants in view of both the corporate relationships in this case and the other factors weighed by that court. Accordingly, we hold that the bankruptcy court did not abuse its discretion in concluding that the equities favored Cambridge and in declaring that Cambridge was licensed to practice the inventions of the ’391 and ’496 patents.
 

 F.
 
 The 1% Royalty Rate for Past Infringement and Future Practice of the ’861 ■ Patent
 

 Appellants advance several reasons why the bankruptcy court allegedly erred in setting a 1% royalty rate under the 1987 Agreement as damages for past infringement and compensation for future practice of the ’861 patent. Appellants first argue that the bankruptcy court misinterpreted the 1987 Agreement in concluding that Cambridge is entitled to the same license terms as Genetic for Institut Pasteur’s improvement technology. Appellants contend that the court’s interpretation-that ¶ 2 covers pre-settlement exclusive licenses to PSD and Genetic reads ¶ 4 out of the Agreement. Appellants next argue that even if Cambridge were entitled to the same license terms for the improvement technology as Genetic, the court erred in using 6% as the total consideration paid by Genetic for all of Institut Pasteur’s technology; this miscalculation, appellants continue, resulted in an artificially low 1% rate for improvement technology when the court subtracted the 5% “existing royalty rate” (see ¶ 6) as directed by ¶ 3. Appellants contend that in addition to the 6% royalty, Genetic is paying and has paid a significant amount of other consideration. Appellants lastly argue that the bankruptcy court erred in not considering a hypothetical negotiation in 1993, when infringe
 
 *1377
 
 ment began, and in not deciding that such a negotiation would have resulted in a license at 15% royalty, plus an up-front payment of $500,000.
 

 Cambridge essentially responds that appellants should not be allowed to rewrite ¶ 2; since the 1987 Agreement is unambiguous, its plain language must be enforced under Maryland law.
 
 [12]
 
 Cambridge continues that based on a plain reading, the bankruptcy court’s interpretation of ¶ 2 does not read ¶ 4 out of the agreement. As for the 1% rate, we understand Cambridge to argue that while Genetic provides and has provided consideration beyond the 6% royalty, the 1% royalty rate for the ’861 patent alone is not artificially low because, unlike Cambridge, Genetic receives the benefit of
 
 all
 
 of Instituí Pasteur’s technology, in effect offsetting the additional consideration. Cambridge lastly asserts that the bankruptcy court properly disregarded the testimony of Genetic’s President, Terrance Beiker, regarding a hypothetical negotiation.
 

 “A reasonable royalty ‘may be based upon an established royalty, if there is one, or if not upon a hypothetical royalty resulting from arm’s length negotiations between a willing licensor and a willing licensee.’ ”
 
 See Trell v. Marlee Elees. Corp.,
 
 912 F.2d 1443, 1445, 16 U.S.P.Q.2d 1059, 1061 (Fed.Cir.1990) (quoting
 
 Hanson v. Alpine Valley Ski Area, Inc.,
 
 718 F.2d 1075, 1078, 219 U.S.P.Q 679, 682 (Fed.Cir. 1983).) “When a ‘reasonable royalty’ is the measure, the amount may again be considered a factual inference from the evidence, yet there is room for exercise of a common-sense estimation of what the evidence shows would be a ‘reasonable’ award.”
 
 Lindemann Maschinenfabrik, GmbH v. American Hoist & Derrick Co., Hams Press & Shear Div.,
 
 895 F.2d 1403, 1406, 13 U.S.P.Q.2d 1871, 1874 (Fed.Cir. 1990).
 

 It is well-established that Maryland follows the objective law of contracts.
 
 See Adloo v. H.T. Brovm Real Estate, Inc.,
 
 344 Md. 254, 686 A.2d 298, 304 (1996);
 
 General Motors Acceptance Corp. v. Daniels,
 
 303 Md. 254, 492 A.2d 1306, 1310 (1985). In
 
 General Motors,
 
 the Court of Appeals of Maryland explained how a court should interpret a contract:
 

 A court construing an agreement under this test must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed .... [T]he clear and unambiguous language of an agreement will not give away [sic, way] to what the parties thought that the agreement meant or intended it to mean. As a result, when the contractual language is clear and unambiguous, and in the absence of fraud, duress, or mistake, parol evidence is not admissible to show the intention of the parties or to vary, alter, or contradict the terms of that contract.
 

 See General Motors,
 
 303 Md. 254, 492 A.2d 1306-10.
 

 Based on the foregoing guidelines, we agree with Cambridge that the bankruptcy court did not abuse its discretion in using the 1987 Agreement as the basis for calculating a reasonable royalty, nor did the court clearly err in awarding appellants a 1% royalty. The parties do not dispute that Cambridge is entitled to a license under the 1987 Agreement,
 
 see
 
 Appellants’ Br. at 38, so it is clear that the bankruptcy court did not abuse its discretion in looking to that agreement to calculate the proper damage award. Accordingly, we need not address appellants’ arguments regarding alternate methods for computing damages, specifically hypothetical negotiation. We are left to con
 
 *1378
 
 sider appellants’ arguments concerning the interpretation of the 1987 Agreement and the resulting calculation of a 1% royalty rate.
 

 Appellants argue that the bankruptcy court misinterpreted ¶ 2 to include pre-settlement exclusive licenses to PSD and Genetic, thereby reading ¶4 out of the agreement, and that moreover, ¶ 2 only covers separate improvement technology licenses. We agree with Cambridge, however, that such pre-settlement licenses are not excluded. The language of ¶ 2 plainly states that:
 

 Improvement Technology made available under subparagraph 2 by one Party to the licensees of the other party shall be made available by the licensor at a royalty rate and under conditions no less favorable than those offered to its own licensees.
 

 Under Maryland law, we see no reason to interpret ¶ 2 other than by what it says,
 
 i.e.,
 
 that Institut Pasteur must license its improvement technology, the ’861 patent, to Cambridge at the same rate as to its sublicensee Genetic. Moreover, this interpretation does not read ¶ 4 out of the Agreement, because that paragraph applies when a party, in this case Institut Pasteur, has not licensed the improvement technology at issue to its
 
 own
 
 licensee. In this case, Institut Pasteur
 
 had already licensed
 
 the improvement technology to its own sublicensee, Genetic (via PSD), as of 1990. Thus, ¶ 4 simply does not apply, and our construction of ¶ 2 does not render ¶ 4 a nullity as appellants contend.
 

 We are likewise unpersuaded by appellants’ argument that the bankruptcy court clearly erred in arriving at a 1% royalty rate. As noted previously by the bankruptcy court, the parties did not expressly provide for the present contingency in the 1987 Agreement, so the bankruptcy court reasonably followed the procedure of ¶ 3 of the agreement, which provides for calculating the royalty rate for improvement technology in the similar situation in which a licensor licenses both existing and improvement technology to a licensee. While appellants correctly indicate that Genetic has paid and is paying significant consideration in addition to the 6%, Cambridge, unlike Genetic, is only receiving the benefit of a portion of the improvement technology in the form of the ’861 patent. Indeed, the bankruptcy court indicated that an argument could be made that
 
 1%
 
 is in fact
 
 too much. See Pasteur II,
 
 slip op. at 10. Acknowledging the fact that determination of a reasonable royalty involves some degree of “common-sense estimation,”
 
 see id.,
 
 we conclude that the bankruptcy court did not clearly err in determining that appellants were entitled to a 1% royalty rate.
 

 We have considered the parties’ other arguments but conclude that they do not alter our decision. Inasmuch as appellants’ appeal has not succeeded, Cambridge’s cross-appeal is moot.
 

 CONCLUSION
 

 The bankruptcy court did not err in holding that the proceeding before it was a “core proceeding,” and it properly denied appellants’ motion for a jury trial. The bankruptcy court also did not err in holding that PSD was not an indispensable party under Rule 19, and thus it properly denied appellants’ motion to dismiss certain portions of Cambridge’s Answer and Counterclaim. The bankruptcy court did not err in granting summary judgment of noninfringement in favor of Cambridge as to the ’391 and ’496 patents, nor did it abuse its discretion in declaring that these patents were “licensed patents” under the 1989 Agreement. As for the ’861 patent, the bankruptcy court did not abuse its discretion by looking to the 1987 Agreement to calculate a royalty rate for Cambridge’s past acts of infringement as well as its future practice of the patent; the bankruptcy court did not clearly err in arriving at a 1% royalty rate. Because we conclude that the bankruptcy court properly ruled on all the issues before us on appeal, we have concluded that the district
 
 *1379
 
 court properly affirmed these rulings
 
 in toto.
 
 Accordingly, we
 

 AFFIRM.
 

 [1]
 

 . To fully understand the origin of the 6% rate, one must look at additional licensing agreements between Institut Pasteur and its affiliates. The bankruptcy court concisely outlined these licensing agreements in
 
 Institut Pasteur v. Cambridge Biotech Corp. (In re Cambridge Biotech Corp.),
 
 No. 94-43054-JFQ, slip op. at 7 n.2 (Bankr.D.Mass. Jan. 5, 1996).
 

 [2]
 

 . The bankruptcy court resolved all of the issues between the parties in two opinions,
 
 Institut Pasteur v. Cambridge Biotech Corp. (In re Cambridge Biotech Corp.),
 
 186 B.R. 9 (Bankr.D.Mass. 1995)
 
 (Pasteur I)
 
 and
 
 Institut Pasteur v. Cambridge Biotech Corp. (In re Cambridge Biotech Corp.),
 
 No. 94-43054-JFQ, slip op. (Bankr.D.Mass. Jan. 5, 1996)
 
 (Pasteur II).
 
 On appeal, the district court reviewed the relevant issues in both opinions in
 
 Institut Pasteur v. Cambridge Biotech Corp. (In re Cambridge Biotech Corp.),
 
 212 B.R. 10 (D.Mass.1997)
 
 (Pasteur
 
 III). ■ ■
 

 [3]
 

 .Local Rule 201 provides that:
 

 Pursuant to 28 U.S.C. § 157(a), any and all cases arising under Title 11 United States Code and any and all proceedings arising under Title 11 or arising in or related to a case under Title 11 shall be referred to the judges of the bankruptcy court for the District of Massachusetts.
 

 D.Mass. Rule 201.
 

 [4]
 

 . Under 28 U.S.C. § 157(b)(1), a bankruptcy court may enter judgments and orders only when the proceeding is deemed a "core proceeding” as outlined in § 157(b)(2). Section 157(b)(l')'státes that:
 

 Bankruptcy'judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.
 

 28 U.S.C. §‘ 157(b)(1). In such case, the district court, in its appellate capacity under 28 U.S.C. § 158, reviews the bankruptcy court’s findings of fact under the clearly erroneous standard and its legal conclusions
 
 de novo.
 

 In contrast, if a proceeding is not a "core proceeding” but is a "related proceeding,” 28 U.S.C. § 157(c)(1) provides that the bankruptcy court may only enter proposed findings of fact and conclusions of law, none of which are entitled to deference by the district court:
 

 A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge’s proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.
 

 28 U.S.C. § 157(c)(1). However, § 157(c)(2) provides that, even in a related proceeding, a bankruptcy court may enter orders and judgments as long as the parties all consent:
 

 Notwithstanding the provisions of paragraph (1) of this subsection, the district court, with the consent of all the parties- to the proceeding, may refer a proceeding related to a case under title 11 to a bankruptcy judge to hear and determine and to enter appropriate orders and judgments, subject to review under section 158 of this title.
 

 28 U.S,C. § 157(c)(2). Accordingly, the com- ' plaint makes clear that appellants sought to establish their position that not only was this proceeding not a "core proceeding,” but that even if it were a "related proceeding” they would not consent to the bankruptcy court rendering final judgments or orders.
 

 [5]
 

 . 28 U.S.C. § 157(b)(2) provides in relevant part:
 

 Core proceedings include, but are not limited to—
 

 (B) allowance or disallowance of claims against the estate ... ;
 

 
 *1365
 
 (O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims.
 

 28 U.S.C. § 157(b)(2)(B), (b)(2)(0).
 

 [6]
 

 . On June 5, 1995, appellants moved the district court for leave to appeal the bankruptcy court's order denying its demand for a jury trial.
 
 See
 
 Joint App. at 375. This motion was denied, without formal order, over two years later on August 15, 1997,
 
 see
 
 Joint App. at 25, after the bankruptcy court had entered its final judgment in
 
 Pasteur I
 
 (September 1, 1995) and its amended judgment in
 
 Pasteur II
 
 (February 12, 1996).
 

 [7]
 

 . Rule 19 states in relevant part:
 

 (a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive" the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person’s absence may (i) as a practical matter impair or impede the person’s ability to. protect that interest or (ii) leave any of the -persons already parties subject to- a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If-the person has not been so joined, the court shall order that the person be made a party. If the person should join as a plaintiff but refuses to do so, the person may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and joinder of that party would render the venue of the action improper, that party shall be dismissed from the action.
 

 (b) Determination by Court Whenever Joinder not Feasible,. If a person as described in subdivision (a)(l)-(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person’s absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person’s absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.
 

 Fed.R.Civ.P. 19.
 

 [8]
 

 . Section 158(a) states in relevant part:
 

 The district courts of the United States shall have jurisdiction to hear appeals (1) from final judgments, orders, and decrees ...
 

 of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title. An appeal under this subsection shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving. ,
 

 28 U.S.C. § 158(a).
 

 [9]
 

 . Article 8, ¶ 8.2 states:
 

 This Agreement contains the entire understandings among the parties hereto with respect to the transactions contemplated herein, and no party shall be bound by, or shall be deemed to have made, any representations and warranties except those, contained in this Agreement.
 

 See
 
 Joint App. at A1277.
 

 [10]
 

 . Under Article 10 of the 1989 Agreement, the parties agreed that the agreement would be governed by the law of Massachusetts.
 
 See
 
 Joint App. at A1278.
 

 [11]
 

 . When a court considers disregarding the corporate entity,
 
 i.e.,
 
 “piercing the corporate veil,” the court applies the law of the state of incorporation.
 
 See Stromberg Metal Works, Inc. v. Press Mechanical, Inc.,
 
 77 F.3d 928, 933 (7th Cir.1996).
 

 [12]
 

 . As to the interpretation of the 1987 Agreement, we will apply Maryland law, as the parties agreed in Article XIII that Maryland law should govern the agreement.
 
 See Joint
 
 App. atA1881.